J.A22038/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| YVETTE ANDREA ROTUNDO, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PATRICK BRADLEY JONES, | : | |
| | : | |
| | : | No. 2213 MDA 2013 |

Appeal from the Order Entered November 13, 2013
In the Court of Common Pleas of Berks County
Civil Division No(s).: 12-19816 #1

BEFORE: PANELLA, SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                **FILED OCTOBER 08, 2014**

Appellant, Yvette Andrea Rotundo, appeals from the order entered in the Berks County Court of Common Pleas dismissing her complaint in divorce. Appellant challenges the court's finding that a common law marriage did not exist between her and Appellee, Patrick Bradley Jones. We affirm.

The parties began co-habitating "in 1991, right before" their older daughter, who was twenty-three years old at the time of the hearing, was born. N.T., 11/1/13, at 9. On August 24, 2012, Appellant filed a complaint in divorce seeking alimony, equitable distribution of marital property,

---

[*] Former Justice specially assigned to the Superior Court.

alimony *pendente lite*, spousal support, counsel fees, costs and expenses, and child custody. She claimed she and Appellee entered into a common law marriage on May 12, 1996. On September 11, 2012, pursuant to 23 Pa.C.S. § 3306,[1] Appellee filed an answer and counterclaim for declaratory judgment that there was no marriage. A hearing was held on November 1, 2013.

Appellant testified, *inter alia*, as follows:

> [Counsel for Appellant]: Do you believe that you are married?
>
> A: Yes.

---

[1] Section 3306 provides:

> When the validity of a marriage is denied or doubted, either or both of the parties to the marriage may bring an action for a declaratory judgment seeking a declaration of the validity or invalidity of the marriage and, upon proof of the validity or invalidity of the marriage, the marriage shall be declared valid or invalid by decree of the court and, unless reversed upon appeal, the declaration shall be conclusive upon all persons concerned.

23 Pa.C.S. § 3306. The trial court opined:

> As the existence of a valid marriage is a fundamental requirement to processing an action in divorce, the issue raised is one of subject matter jurisdiction. The issue of subject matter jurisdiction can be raised by either party or the Court at any time. ***Bernhard v. Bernhard***, 668 A.2d 546, 548 [Pa. Super. 1995]. Accordingly, the fact that the issue was raised through a counterclaim rather than through a preliminary objection is not fatal.

Trial Ct. Op., 1/28/14, at 1 n.1.

Q: Do you believe that the words of present intent were spoken to you?

A: Yes.

Q: And that you also responded?

A: Yes.

Q: . . . [W]hat was the date on which you say that the words of present intent were spoken to you?

A: It was Mother's Day, May 12, 1996.

Q: And why are you so sure that it was that date?

A: Because the events that led up to it, and something that was given to me at the end of the day. It just all came back in a very distinct memory, and was also a big turning point in our relationship.

Q: . . . The words of present intent. Where were you when they were spoken?

A: They were spoken—we had bought—were in the plans [sic] of buying a house, and the house that I am currently living in.

Q: Who is we?

A: Me and [Appellee] were buying a house together.

*   *   *

Q: At that point, you had two children?

A: Correct.

Q: Were the children with you at that—when the time of the words of present intent were spoken?

A: Yes, they were.

Q: How old were they?

A: [S.] would have been 5, and [H.] was just like 7 months old.

\* \* \*

Q: . . . And you were looking to buy a house?

A: We had already been accepted. Our offer was accepted and we went to the property that afternoon to just take another look around. . . .

\* \* \*

Q: . . . . [W]here exactly were the words spoken on the property?

A: [T]his is a farmhouse, . . . and [Appellee] and I were standing on the bridge[.]

And I said to [Appellee], you know, now that we are buying this house do you think that we should go forward and have a more formal ceremony as far as the marriage? And he turned and he looked at me and grabbed me around my waist, and he looked at me . . . and he said buying this house is a very big commitment for me. And he said, I am not taking this lightly. He said as far as I am concerned, you and I are married, and I am your husband, and you are my wife, and I am committed to nobody else but you.

And I looked at him, and I kind of got cute about it because that was the first time that I heard him call me—refer to me as his wife, at least to my face. He had been introducing me as his wife prior to that. But I looked at him, and I said I am committed to you, and I am your wife, and, yes, you are my husband.

And we just proceeded to talk more about the property. But that was the first time the words were spoken in that way.

\* \* \*

Q: I show you what has been marked as Exhibit No. 1. What is that?

A: It is a Mother's Day card given to me later that day.

Q: All right.

A: By [Appellee].

Q: Is this signed?

A: Yes, it is.

Q: Is it dated?

A: Yes, it is.

Q: What is the date?

A: May 12, 1996.

Q: Would you please read the front of the card?

A: I love you my wife, on Mother's Day and always. I love you my wife. . . .

N.T., 11/1/13, 8-10, 12-14. Appellee testified that he never told Appellant he was her husband and she was his wife. *Id.* at 38.

On November 13, 2013, the trial court entered an order dismissing the complaint in divorce. This timely appeal followed. Appellant was not ordered to filed a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. The trial court filed a Pa.R.A.P. 1925(a) opinion.

Appellant raises the following issue for our review: "Did the trial court commit an abuse of discretion and/or commit an error of law in finding that a common law marriage did not exist between the parties?" Appellant's

Brief at 5. Appellant argues "that the parties exchanged words in the present tense for the purpose of establishing a marital contract." *Id*. at 9. In support, Appellant cites her testimony at the hearing. *Id.* at 9-12, 20-21, 23-24. Appellant avers "[i]t is clear from [her] testimony that the words of present intent were spoken and that [Appellee] then followed and reinforced those words with a card addressed to 'My Wife.'" *Id.* at 12. Appellant contends that on March 19, 2003, Appellee presented her with a ring in front of their children and he stated that it represented their marriage. *Id.* at 20-21. She claims she met her burden of proof that the parties entered into a common law marriage.[2] *Id.* at 25. We disagree.

We first note the relevant standard of review where the court finds that there is no common law marriage: "That finding, if supported by competent evidence, is entitled to the same weight as the verdict of a jury. A decree based thereon will not be reversed in the absence of an abuse of discretion or an error of law." *In re Estate of Kovalchick*, 498 A.2d 374, 376 (Pa. Super. 1985).

This Court has stated:

---

[2] In 2005, the legislature abolished common law marriage in Pennsylvania: "No common-law marriage contracted after January 1, 2005, shall be valid. Nothing in this part shall be deemed or taken to render any common-law marriage otherwise lawful and contracted on or before January 1, 2005, invalid." 23 Pa.C.S. § 1103. This amendment does not impact the case at bar, as Appellant claims "the parties entered into a common law marriage when the exchange of words were spoken [in 1996] and these words were then spoken again some years later in front of the parties' children with the presentation of a ring [in 2003.]" *See* Appellant's Brief at 25.

Marriage in Pennsylvania is a civil contract by which a man and a woman take each other for husband and wife. There are two kinds of marriage: (1) ceremonial; and (2) common law. A ceremonial marriage is a wedding or marriage performed by a religious or civil authority with the usual or customary ceremony or formalities.

Because claims for the existence of a marriage in the absence of a certified ceremonial marriage present a "fruitful source of perjury and fraud," Pennsylvania courts have long viewed such claims with hostility. Common law marriages are tolerated, but not encouraged. . . .

**A common law marriage can only be created by an exchange of words in the present tense, spoken with the specific purpose that the legal relationship of husband and wife is created by that.** Regarding this requirement for an exchange of words in the present tense, this Court has noted:

> [I]t is too often forgotten that a common law marriage is a marriage by the express agreement of the parties without ceremony, and almost invariably without a witness, by words—not *in futuro* or *in postea*, but—*in praesenti*, uttered with a view and for the purpose of establishing the relationship of husband and wife.

The common law marriage contract does not require any specific form of words, and all that is essential is proof of an agreement to enter into the legal relationship of marriage at the present time.

The burden to prove the marriage is on the party alleging a marriage, and we have described this as a "heavy" burden where there is an allegation of a common law marriage. When an attempt is made to establish a marriage without the usual formalities, the claim must be reviewed with "great scrutiny."

***Staudenmayer v. Staudenmayer***, 714 A.2d 1016, 1019-20 (Pa. 1998)

(emphasis added, footnotes and citations omitted).

Instantly, after careful review of the record, including the notes of testimony of the November 1, 2013 hearing, the parties' briefs, and the well-reasoned decision of the Honorable Scott E. Lash, we affirm on the basis of the trial court's decision, finding that the evidence did not establish a common law marriage. **See** Trial Ct. Op. at 1-11 (finding, *inter alia*: (1) testimony of both parties was self-serving and of questionable credibility; (2) complaint in divorce contradicted Appellant's testimony that parties were married on May 12, 1996, setting forth the date of the marriage as March 19, 2003; (3) Appellant failed to state date of marriage on her child support complaint; (4) deed for property purchased in 1996 "set forth that the parties are owners 'as joint tenants with right of survivorship and not as tenants in common;" (5) parties refinanced property in 2010 and Appellant stated marital status was "single;" (6) parties' federal tax returns were filed as "head of household" or as "single"). We discern no abuse of discretion by the trial court. **See Estate of Kovalchick**, 498 A.2d at 376. Accordingly, we affirm the trial court's order dismissing the complaint in divorce.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/8/2014

- 8 -

YVETTE ANDREA ROTUNDO,

              Plaintiff

        vs.

PATRICK BRADLEY JONES,

            Defendant

: IN THE COURT OF COMMON PLEAS OF
: BERKS COUNTY, PENNSYLVANIA
: CIVIL ACTION - LAW
:
: NO. 12-19816 #1
:
: DIVORCE
:
:
: ASSIGNED TO: LASH, J.

Robert T. Ullman, Esquire, attorney for Plaintiff, Yvette Andrea Rotundo

David S. Sobotka, Esquire, attorney for Defendant, Patrick Bradley Jones

## MEMORANDUM OPINION, SCOTT E. LASH, JUDGE     JANUARY 27, 2014

The Plaintiff, Yvette Andrea Rotundo, (hereinafter "Rotundo"), has appealed this Court's Order entered November 13, 2013, dismissing the above-captioned divorce action based on the Court's finding that the parties were never married. The issue of marriage status was raised by Defendant, Patrick Bradley Jones, (hereinafter "Jones"), in a Counterclaim to the divorce action, requesting declaratory judgment relief pursuant to 23 Pa.C.S.A §3306.[1]

Rotundo claimed that the parties entered into a common law marriage on May 12, 1996, when, with the intention of becoming husband and wife, the parties exchanged words for that purpose. Rotundo also alleged the existence of the marriage in her divorce Complaint, although in the Complaint, she set forth that: "The parties were married under Pennsylvania Common Law not later than

---

[1] As the existence of a valid marriage is a fundamental requirement to processing an action in divorce, the issue raised is one of subject matter jurisdiction. The issue of subject matter jurisdiction can be raised by either party or the Court at any time. Bernhard v. Bernhard, 668 A.2d 546, 548, 447 Pa.Super. 118, 123-24 (1995). Accordingly, the fact that the issue was raised through a counterclaim rather than through a preliminary objection is not fatal.

March 19, 2003, at which time [Jones] presented [Rotundo] with a ring before witnesses including the couple's three children, affirming their marital status as husband and wife." Jones denies entering into a common law marriage with Rotundo on May 12, 1996, March 19, 2003, or at any other time. After hearing held on November 1, 2013, the Court entered its Order of November 13, 2013 dismissing the divorce Complaint, finding that the parties were never married, Rotundo having failed to meet her burden that a marriage contract exists.

The doctrine of common law marriage, once valid in Pennsylvania, has been abolished, although Pennsylvania continues to recognize common law marriages entered into before January 1, 2005.[2] This Court notes, however, that this recognition is provided reluctantly, as marriages without a ceremony present a "fruitful source of perjury and fraud." Staudenmayer v. Staudenmayer, 714 A.2d 1016, 1019, 552 Pa. 253, 261 (1998).

In Staudenmayer, the Pennsylvania Supreme Court set forth what is required to create a common law marriage:

> A common law marriage[FN5] can only be created by an exchange of words in the present tense, spoken with the specific purpose that the legal relationship of husband and wife is created by that. *Commonwealth v. Gorby*, 527 Pa. 98, 110, 588 A.2d 902, 907 (1991). Regarding this requirement for an exchange of words in the present tense, this Court has noted:
>
> FN5. Black's defines "common law marriage" as:
>
> One not solemnized in the ordinary way (i.e. non-ceremonial) but created by an agreement to marry,

---

[2]   23 Pa.C.S.A. § 1103 sets forth that: "No common-law marriage contracted after January 1, 2005, shall be valid. Nothing in this part shall be deemed or taken to render any common-law marriage otherwise lawful and contracted on or before January 1, 2005, invalid."

followed by cohabitation. A consummated agreement to marry, between persons legally capable of making marriage contract, per verba de praesenti, followed by cohabitation. Such marriage requires a positive mutual agreement, permanent and exclusive of all others, to enter into a marriage relationship, cohabitation sufficient to warrant a fulfillment of necessary relationship of man and wife, and an assumption of marital duties and obligations.

Black's Law Dictionary 251 (6th ed. 1979).

[I]t is too often forgotten that a common law marriage is a marriage by the express agreement of the parties without ceremony, and almost invariably without a witness, by words-not in futuro or in postea, but-in praesenti, uttered with a view and for the purpose of establishing the relationship of husband and wife. *Estate of Manfredi*, 399 Pa. [285] at 291, 159 A.2d [697] at 700 (citations omitted). The common law marriage contract does not require any specific form of words, and all that is essential is proof of an agreement to enter into the legal relationship of marriage at the present time. *Estate of Gavula*, 490 Pa. 535, 540, 417 A.2d 168, 171 (1980).

Staudenmayer, 714 A.2d at 1020.

Claims of common law marriage are to be reviewed by the court with "great scrutiny." Where, as here, the parties are available to testify regarding "*verba in praesenti*," the exchange of words in the present tense for the purpose of establishing the relationship of husband and wife, the burden of proof rests with the party claiming the common law marriage to produce clear and convincing evidence of said exchange of words. Id., A.2d at pp. 1020 and 1021.[3]

In support of her claim, Rotundo testified that an exchange of words in the present tense did take place, occurring on Mother's

---

[3] In cases when one party is unavailable to testify, the Court permits a rebuttable presumption in favor of a common law marriage if the party asserting the marriage can establish constant cohabitation and a reputation of marriage, "which is not partial or divided but is sought in general." Staudenmayer, 714 A.2d at pp. 1020-21. This rebuttable presumption does not apply here.

3

Day, May 12, 1996. (N.T. p. 8). She states that on that date, the parties were together with their two (2) very young children, viewing real property that they had recently agreed to purchase. Ms. Rotundo testifies:

> ...And I was talking about the fact that we were buying this home together, and our relationship -- the commitment that we were making to one another.
>
> And I said to [Jones], you know, now that we are buying this house do you think that we should go forward and have a more formal ceremony as far as the marriage? And he turned and he looked at me and grabbed me around my waist, and he looked at me -- and he just had that -- he has this charming little face, and he said buying this house is a very big commitment for me. And he said, I am not taking this lightly. He said as far as I am concerned, you and I are married, and I am your husband, and you are my wife, and I am committed to nobody else but you.
>
> And I looked at him, and I kind of got cute about it because that was the first time that I heard him call me -- refer to me as his wife, at least to my face. He had been introducing me as his wife prior to that. But I looked at him, and I said I am committed to you, and I am your wife, and, yes, you are my husband. [N.T. pp. 12-13].

Later on that same day, Jones presented Rotundo with a Mother's Day card which featured preprinted material, including, among other things, the statement: "I love you, my wife." (N.T. p. 14, Rotundo's Exhibit No. 1).

For his part, Jones denied the existence of the common law marriage. His testimonial denials present the position that he never formed the intent to marry Rotundo and never stated the requisite words of present intent. He never considered Rotundo to be his wife, nor held her out to third parties as owning that status.

4

This Court found both parties' testimony to be self-serving and of questionable credibility. One point of fact compromising Rotundo's position that a marriage took place on May 12, 1996 was the language set forth in her divorce Complaint. The Complaint, which Rotundo admits was drafted by her attorney in accordance with information provided by her and which was verified by her, sets forth in paragraph 4:

> 4. The parties were married under Pennsylvania Common Law not later than March 19, 2003, at which time [Jones] presented [Rotundo] with a ring before witnesses including the couple's three children, affirming their marital status as husband and wife.

In attempting to explain this inconsistency, Rotundo testified that on March 19, 2003, while having domestic difficulties and wanting to "reinforce the fact that we were married," she received a ring from Jones. She goes on to state:

> [Jones] brought it for me, and it was the evening of this day that he presented it. He got down on his hands (sic) and he said I present to you this ring. It is a ring that I was never able to provide you before. It represents our marriage and our commitment to each other as a family. And all of my kids were there, and my oldest one was jumping up and down, clapping because she thought that it was exciting. And I have the ring. I am wearing it now. (N.T. p. 29).

Rotundo testified that she was under "extreme duress" at the time she filed the divorce Complaint. She testified she did not want to file for a divorce but did so because she felt threatened that she was about to be "thrown out" of the parties' home through a partition action. According to Rotundo, her attorney advised her to file the divorce action to stop the partition action. She agreed but was unable to remember the exact date of the common law marriage, (N.T. p. 33), so chose to rely upon the

5

date of the "ring ceremony."

On this issue, the Court questioned Rotundo:

THE COURT: Did you advise your counsel that, you know, you were married, but it could have been May 1996 or it could have been as late as 2003?

THE WITNESS: I did say that. I mean I told .. this whole time in my life when this all occurred, was a horrible time for me, and I was scared, and I was afraid that I would be kicked out of my house on a partition action.... I went into see [counsel], and I told her what was happening, and this divorce complaint was filed because I was afraid that he would come back and file a partition.... And I -- he told me that I could pretty much be court ordered out of my home. And so, you know, I didn't have time to like -- I didn't have time to get all of my eggs in my basket and think.

I knew that words were spoken, I couldn't exactly remember the date. I did remember the ring because this was something that I found right away. But there is a long history here. It is not just a black and white, as this is being presented. (N.T. p. 35-36).

The import is that Rotundo, at the time of the filing of the divorce Complaint, was willing to accept one of two dates for the common law marriage, and decided to rely on the March 19, 2003 date as a fallback position because of her inability to recall the earlier date, and because she could better corroborate the 2003 date. In essence, what she stated to this Court was: "I was married on May 12, 1996 and words of present intent were exchanged, but at the time Jones was threatening to have me removed from the house, I was unable to remember the date of the marriage so I alleged in the divorce Complaint a date I thought I could prove, March 19, 2003, even though the marriage was sometime prior to that date." While it is true that some people are unable to remember the date of their marriage, this pragmatic approach, while possibly serving her immediate concerns, contradicted her claim of

6

conviction that she was married on May 19, 1996.

In a similar vein was her testimony regarding the failure to fill out a marriage date on her child support complaint filed on April 10, 2013. In response to the question: "Did you fill in a date of marriage when you filed this?" she stated: "Apparently not. I filled this out on my own. I didn't have anybody guiding me on what to do here." (N.T. p. 21). A person truly married should not need the advice of counsel or some other third party to advise her on how to respond to a question about the date of her marriage.

The parties provided testimony from friends and relatives and documentation for the purpose of corroborating their position. The testimony of the friends and relatives provided little guidance. With the exception of her father and to some extent the parties' son, Rotundo's witnesses were able to provide only general information, based on assumptions they reached from the fact that the parties were residing together, had children together, and in some ways acted in a manner consistent with that of a husband and a wife. Likewise, Jones' witnesses were unable to provide anything conclusive.

The other evidence, however, documentation and discussions on actions taken by the parties, supported Jones' position. As stated, there were the averments set forth in the divorce Complaint and the child support documentation, both containing statements from Rotundo which were inconsistent with her position that the parties entered into a common law marriage on May 12, 1996. Additionally, there was the deed for the property purchased by the

7

parties, the deed being executed on May 24, 1996, after Rotundo's purported date for the marriage. The deed sets forth that the parties are owners "as joint tenants with right of survivorship and not as tenants in common." (Jones' Exhibit 2). In speaking on the reasons why the parties were listed as joint tenants with the right of survivorship, Rotundo stated:

> ...We had concerns that we were in a committed relationship, but we were not -- we didn't have a marriage certificate. We wanted to be sure when we learned about tenants in common that meant that if something happened to one of his, his half would go into an estate.... I was concerned about if something happened to one of us, that we wouldn't get the house. We explained to them that we were in a common law, committed relationship, and that is the advice they gave us was to write it up like that. (N.T. 172-173).

Rotundo's stated motive for the designation of joint tenants with right of survivorship is consistent with a plan for two single people having joint ownership of real property and desiring that should one party pass away, the other would receive full and sole ownership by operation of law, a circumstance that would not take place if the designation was as tenants in common. It, however, is not consistent with a married couple entered into joint ownership for real property, for then the designation would be tenancy by the entireties.

Further, in 2010, the parties refinanced the jointly held residence. The supporting documentation for the refinancing included a notation that Jones' marriage status was "single." Although Rotundo testified that she did not recall ever viewing this documentation, she does admit that her signature appears on the signature affidavit, and was entered in the presence of a Notary Public. (N.T. pp. 190-195; Jones' Exhibit No. 4).

8

The parties' federal tax returns are also inconsistent with Rotundo's position. The parties did not file joint tax returns as husband and wife, rather each filed as "head of household" or as "single." (N.T. p. 190, 230; Jones' Exhibit No. 7). The Internal Revenue Service publications set forth that to be able to claim "head of household," you have to be "unmarried" which, in pertinent part, means the parties would be single and unmarried, or if married, were living apart for the last six (6) months of the tax year.[4]

Another inconsistency appears when Rotundo, in an attempted support of her position, points out that Jones had listed her as a "spouse" on his employee health care plan. (See for example, Rotundo Exhibit No. 6, Application For Employment/Change). This document, however, is contradictory on its face, for while it does list Rotundo as a spouse, it also lists Jones as "single." (N.T. pp. 110-115). Further, Rotundo admitted that she was first listed as a "spouse" on Jones' health insurance in 1992 and 1993, a time when both parties agree that they were not married. (N.T. p. 179). Rotundo stated: "I knew that in order for me to obtain health insurance I had to be listed as a spouse." (N.T. p. 180). Thus, it is apparent that Rotundo, and for that matter Jones, were willing to hold themselves out as married, even though they were not married, when it assisted their financial agenda. Another example occurred in 1995, when the parties represented themselves as married to St. Ignatius School. Rotundo states: "We wanted to

---

[4]  See for example, Internal Revenue Service Instructions 2012, under "Filing Status."

9

emulate that we were married, and a married couple so we used [Joneses] name. Especially being in a Catholic school." [N.T. p. 183]. (Emphasis supplied.)

As is apparent, Rotundo's evidence fell far short of the "clear and convincing" standard required to establish a common law marriage. A better categorization of her evidence would be muddy, unconvincing, and at times, audacious. While Jones, therefore, prevailed on the within Motion, this Court must state that some of his actions were likewise troubling. Jones, as well as Rotundo, misrepresented to Jones' health care provider and to a Catholic school. They filed tax returns, which may be called into question.

These parties are prime examples on why it was sound to abolish the doctrine of common law marriage in Pennsylvania. In PNC Bank Corporation v. W.C.A.B., 831 A.2d 1269, 1281 (Pa.Cmwlth. 2003), the Pennsylvania Commonwealth Court drives home this point:

> Finally, the conclusion seems inescapable that recognizing as married only those who have duly recorded their union pursuant to the Marriage Law will greatly reduce the need for litigation to determine marital status. Even where litigation is necessary, it will obviate the need for intensive fact inquiries into the details of parties' relationships and greatly decrease the opportunity to present the sort of fraudulent and perjurious claims our Supreme Court, and others, have repeatedly lamented. In hearing cases such as this, we have been struck by the tendency of litigants in these matters to view common law marriage as something rather like a legal raincoat they can put on and take off as changing circumstances dictate. We see records in which couples have told one side of the family that they were married and the other side that they were not, depending upon what each collection of relatives might approve. Other couples may swear in applying for benefits that they are man and wife, but file tax returns averring under penalty of perjury that they are single. One attorney in oral argument, when asked how he could explain affidavits to the IRS inconsistent with the testimony of his client in the litigation then before the court, replied matter-of-factly that he assumed it

10

lowered their tax liability. What is truly astonishing is not that parties take inconsistent positions to gain advantage, but that they seem to see nothing particularly inappropriate in their chameleon-like behavior. We must conclude that this court can no longer place its imprimatur on a rule which seems to be a breeding ground for such conduct and its attendant disrespect for the law itself.

This Court respectfully requests Your Honorable Court AFFIRM this Court's Order of November 13, 2003, and DENY the appeal of Yvette Andrea Rotundo.

Respectfully submitted,

BY THE COURT:

Scott E. Lash, J.