714 A.2d 1016

**Theodore STAUDENMAYER, Appellant,**

**v.**

**Linda STAUDENMAYER, Appellee.**

Supreme Court of Pennsylvania.

Argued Feb. 2, 1998.

Decided July 23, 1998.

Daniel P. Lyons, Stroudsburg, for Theodore Staudenmayer.

Marion O'Malley, Montrose, for Linda Staudenmayer.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION

NEWMAN, Justice.

This case presents the issue of whether the Superior Court erred when it reversed the trial court and found the existence of a common law marriage prior to a ceremonial marriage between the parties. We reverse and reinstate the trial court's conclusion that the parties were not married prior to their ceremonial marriage.

Theodore Staudenmayer (Theodore) and Linda Staudenmayer (Linda) were married in a civil ceremony performed on December 16, 1984. The Staudenmayers had lived together since March of 1976 and cohabited continuously, except for one brief period, until their final separation in April of 1992. They have one daughter, who was born in March of 1979. Theodore filed for divorce on May 12, 1992, with the result being that there were equitable distribution proceedings.

The trial court held a hearing on January 22, 1996 regarding the equitable distribution of the marital estate. The most contentious issue concerned a structured tort settlement which Theodore received from a personal injury from a forklift accident that occurred sometime in 1982 or 1983. This tort claim was settled in April of 1984, and resulted in monthly payments to Theodore of six hundred dollars ($600.00), with a lump-sum payment of seventy thousand dollars ($70,000.00) on April 4, 2004. Theodore argued that this settlement did not constitute marital property because it occurred prior to the Staudenmayers' wedding in December of 1984. Linda claimed that the tort settlement was marital property because the Staudenmayers had a common law marriage as early as 1978.

In support of her assertion that she and Theodore had a common law marriage before the date of the tort claim, Linda testified that they maintained joint checking accounts as Linda and Theodore Staudenmayer in 1978. She further testified that she began using Staudenmayer as her last name in 1978, and that she changed her Social Security card, driver's license and credit cards at that time to identify her as Linda Staudenmayer. The deed to the Staudenmayers' marital residence in Franklin Township, which was dated August 4, 1978, was conveyed to "Theodore A. Staudenmayer and Linda L. Staudenmayer, his wife ... as Tenants by the Entirety." In addition, Linda testified that the Staudenmayers filed federal income tax returns as "married, filing jointly," beginning in 1978.

On direct examination, Linda testified regarding the establishment of the common law marriage between her and Theodore:

Q. At any time prior to 1984, did you and Mr. Staudenmayer say to each other, we're married or anything to that effect?

A. Yes.

Q. When, do you remember?

A. Probably off and on all through the relationship.

Q. And initially, in 1978?

A. Mostly from 1978 on, he always introduced me as his wife and we just presented ourselves as a [sic] married people.

Q. Did you actually tell people that you were Mr. Staudenmayer's wife before 1984?

A. Yes.

Notes of Testimony, 1/22/96, at 30–31. Following this exchange, however, Linda was asked:

Q. What about members of your family?

A. Immediate members of my family?

Q. Yes, did you tell them that you were husband and wife?

A. I didn't tell my immediate family that we were married. Ted wanted me to present that to his parents.

Q. Did you?

A. I just left it to him.

N.T., 1/22/96 at 31.

During cross-examination, Linda admitted that she and Theodore had a civil marriage ceremony. She further admitted that she indicated on support papers filed in March of 1993 that the date of her marriage was December 14, 1985,[1] and, in response to a question concerning her marital status at the time of her daughter's birth, she wrote "not married." Regarding the change of her name on her credit cards, driver's license, and Social Security card, Linda admitted that Theodore was not required to sign anything to authorize the change, nor did he do so, but stated that "he requested that I do so." Theodore's attorney then attempted to impeach Linda with questions concerning when she first asserted the existence of a common law marriage, suggesting that she did not raise the issue post-separation until after Theodore claimed that the structured tort settlement was not marital property. Although Theodore's attorney did not directly ask Linda why she had a civil marriage ceremony in 1984 if she believed she was already married, Linda testified on redirect examination as follows:

Q. Mrs. Staudenmayer, you referred to the ceremonial date in 1984 as the legal date.

A. Okay.

Q. What do you mean by that?

A. I don't know, the date for legal purposes, I suppose.

Q. But that date has no more significance to you than any date prior to when you and Mr. Staudenmayer lived together?

1. Linda testified at the hearing that the date of the ceremony was December 14, 1985, but the date of the ceremonial marriage pled in Theodore's complaint, and used by Linda's attorney in briefs on the issue, was December 16, 1984.

A. No.

N.T., 1/22/96 at 58.

In an Opinion and Order filed on February 28, 1996, the trial court declared the structured tort settlement to be non-marital property. The court concluded that Linda, as the one alleging a common law marriage, failed to prove "clearly and convincingly" that she and Theodore had exchanged *verba in praesenti*, the present exchange of words uttered for the purpose of establishing the relationship of husband and wife. The court also found that Linda failed to establish, clearly and convincingly, that she and Theodore had a reputation of marriage which is broad and general, and specifically cited Linda's admission that she had not told her immediate family that she and Theodore were married during the time of her purported common law marriage. Accordingly, the court held that the Staudenmayers were not married until their ceremonial marriage in 1984, and that the structured tort settlement, which accrued to Theodore prior to that time, was not part of the marital estate.

The Superior Court reversed the trial court with respect to the structured tort settlement.[2] Contrary to the findings of the trial court, the Superior Court concluded that Linda had established by clear and convincing evidence that she and Theodore were married sometime before the structured tort settlement, and the trial court abused its discretion in holding otherwise. Although noting the inconsistencies in Linda's testimony, the Superior Court found these not "fatal" to Linda's burden, in light of the "numerous, objective indicia of marriage." Slip Opinion, p. 5. We granted allocatur to clarify the burden for proving a common law marriage.

 Marriage in Pennsylvania is a civil contract by which a man and a woman take each other for husband and wife. *In re Estate of Manfredi*, 399 Pa. 285, 291, 159 A.2d 697, 700 (1960). There are two kinds of marriage: (1) ceremonial; and

2. The Superior Court otherwise affirmed the trial court's equitable distribution scheme, and the sole issue in this appeal concerns the finding of a common law marriage.

(2) common law. *Id.* A ceremonial marriage is a wedding or marriage performed by a religious or civil authority with the usual or customary ceremony or formalities. *Id. See* 23 Pa.C.S. § 1501, *et seq.*

■ Because claims for the existence of a marriage in the absence of a certified ceremonial marriage present a "fruitful source of perjury and fraud," Pennsylvania courts have long viewed such claims with hostility. *See In re Estate of Wagner,* 398 Pa. 531, 533, 159 A.2d 495, 497 (1960). Common law marriages are tolerated, but not encouraged. *Id.* While we do not today abolish common law marriages in Pennsylvania,[3] we reaffirm that claims for this type of marriage are disfavored.[4]

■■ A common law marriage[5] can only be created by an exchange of words in the present tense, spoken with the

3. Pennsylvania is among the minority of states that continue to recognize common law marriages. The following are the additional states that recognize common law marriages: **(Alabama)** *Stringer v. Stringer,* 689 So.2d 194 (Ala.Civ.App.1997); **(Colorado)** *In re Marriage of Cargill,* 843 P.2d 1335 (Co.1993); **(District of Columbia)** *Coates v. Watts,* 622 A.2d 25 (D.C.1993); **(Iowa)** *Conklin v. MacMillan Oil Co.,* 557 N.W.2d 102 (Iowa Ct.App.1996); **(Kansas)** *Dixon v. CertainTeed Corp.,* 915 F.Supp. 1158 (D.Kan.1996); **(Montana)** *Matter of Estate of Alcorn,* 263 Mont. 353, 868 P.2d 629 (1994); **(New Hampshire)** *In re Buttrick,* 134 N.H. 675, 597 A.2d 74 (1991) (for inheritance purposes only); **(Oklahoma)** *Matter of Estate of Carroll,* 749 P.2d 571 (Okla.Ct.App.1987); **(Rhode Island)** *Petrarca v. Castrovillari,* 448 A.2d 1286 (R.I.1982); **(South Carolina)** *Barker v. Baker,* 330 S.C. 361, 499 S.E.2d 503 (Ct.App. 1998); **(Texas)** *Russell v. Russell,* 865 S.W.2d 929 (Tex.1993); **(Utah)** *Whyte v. Blair,* 885 P.2d 791 (Utah 1994).

4. Justice Nigro's Concurring Opinion correctly notes the number of jurisdictions that no longer recognize the doctrine of common law marriage. Indeed, the doctrine's continued viability is seriously in question. In the instant case, however, the appellant never raised the validity of the common-law marriage doctrine as an issue, and it would be inappropriate for us to address that question presently.

5. Black's defines "common law marriage" as:

One not solemnized in the ordinary way (i.e.non-ceremonial) but created by an agreement to marry, followed by cohabitation. A consummated agreement to marry, between persons legally capable of making marriage contract, per verba de praesenti, followed by cohabitation. Such marriage requires a positive mutual agreement, permanent and exclusive of all others, to enter into a marriage relationship,

specific purpose that the legal relationship of husband and wife is created by that. *Commonwealth v. Gorby*, 527 Pa. 98, 110, 588 A.2d 902, 907 (1991). Regarding this requirement for an exchange of words in the present tense, this Court has noted:

> [I]t is too often forgotten that a common law marriage is a marriage by the express agreement of the parties without ceremony, and almost invariably without a witness, by words—not in futuro or in postea, but—in praesenti, uttered with a view and for the purpose of establishing the relationship of husband and wife.

*Estate of Manfredi*, 399 Pa. at 291, 159 A.2d at 700 (citations omitted). The common law marriage contract does not require any specific form of words, and all that is essential is proof of an agreement to enter into the legal relationship of marriage at the present time. *Estate of Gavula*, 490 Pa. 535, 540, 417 A.2d 168, 171 (1980).

█ The burden to prove the marriage is on the party alleging a marriage, and we have described this as a "heavy" burden where there is an allegation of a common law marriage. *Id.* at 540, 417 A.2d at 171. When an attempt is made to establish a marriage without the usual formalities, the claim must be reviewed with "great scrutiny." *Id.* at 541, 417 A.2d at 171.

█ Generally, words in the present tense are required to prove common law marriage. *Estate of Wagner*, 398 Pa. at 535–36, 159 A.2d at 498. Because common law marriage cases arose most frequently because of claims for a putative surviving spouse's share of an estate,[6] however, we developed a rebuttable presumption in favor of a common law marriage

cohabitation sufficient to warrant a fulfillment of necessary relationship of man and wife, and an assumption of marital duties and obligations. Black's Law Dictionary 251 (6th ed.1979).

**6.** *See, e.g., Estate of Gavula, supra; Estate of Wagner, supra; Nikitka's Estate,* 346 Pa. 63, 29 A.2d 521 (1943). *See also Estate of Manfredi, supra* (plaintiff sought to establish legitimacy of her birth through claim of her parents' common law marriage in order to share in putative uncle's estate).

where there is an absence of testimony[7] regarding the exchange of *verba in praesenti.* When applicable, the party claiming a common law marriage who proves: (1) constant cohabitation; and, (2) a reputation of marriage "which is not partial or divided but is broad and general," raises the rebuttable presumption of marriage. *See Estate of Manfredi,* 399 Pa. at 291, 159 A.2d at 700. Constant cohabitation, however, "even when conjoined with general reputation are not marriage, they are merely circumstances which give rise to a rebuttable presumption of marriage." *Id.*

Here, however, we are presented with the problem of whether this rebuttable presumption pertains when both parties are alive and able to testify regarding the formation of the marriage contract. We have stated that "the rule which permits a finding of marriage duly entered into based upon reputation and cohabitation alone is one of necessity to be applied only in cases where other proof is not available." *In re Nikitka's Estate,* 346 Pa. 63, 65, 29 A.2d 521, 522 (1943). The "necessity" that would require the introduction of evidence concerning cohabitation and reputation of marriage is the inability to present direct testimony regarding the exchange of *verba in praesenti.* We held in *In re Estate of Stauffer,* 504 Pa. 626, 476 A.2d 354 (1984), that the Dead Man's Act prohibited the purported wife's testimony regarding the exchange of marital vows with her alleged common law husband. There, we noted that the inability of the putative widow to present any testimony regarding the exchange of vows did not prevent her from proving a common law marriage. "Where there is no such proof available," we held, "the law permits a finding of marriage based upon reputation and cohabitation when established by satisfactory proof." *Id* at 632, 476 A.2d at 357.

We have not, however, dispensed with the rule that a common law marriage does not come into existence unless the

7. The Dead Man's Act, 42 Pa.C.S. § 5930, presented a significant problem in this respect. *See Estate of Wagner,* 398 Pa. at 536, 159 A.2d at 498. *See also* discussion of *In re Estate of Stauffer,* 504 Pa. 626, 476 A.2d 354 (1984), *infra.*

parties uttered the *verba in praesenti,* the exchange of words in the present tense for the purpose of establishing the relationship of husband and wife. *See Commonwealth v. Wilson,* 543 Pa. 429, ——, 672 A.2d 293, 301 (1996) (discussing common law marriage in context of a claim of spousal testimonial immunity). We have allowed, as a remedial measure, a rebuttable presumption in favor of a common law marriage based on sufficient proof of cohabitation and reputation of marriage where the parties are otherwise disabled from testifying regarding *verba in praesenti.* However, where the parties are available to testify regarding *verba in praesenti,* the burden rests with the party claiming a common law marriage to produce clear and convincing evidence of the exchange of words in the present tense spoken with the purpose of establishing the relationship of husband and wife, in other words, the marriage contract. In those situations, the rebuttable presumption in favor of a common law marriage upon sufficient proof of constant cohabitation and reputation for marriage, does not arise.

By requiring proof of *verba in praesenti* where both parties are able to testify, we do not discount the relevance of evidence of constant cohabitation and reputation of marriage. When faced with contradictory testimony regarding *verba in praesenti,* the party claiming a common law marriage may introduce evidence of constant cohabitation and reputation of marriage in support of his or her claim. We merely hold that if a putative spouse who is able to testify and fails to prove, by clear and convincing evidence, the establishment of the marriage contract through the exchange of *verba in praesenti,* then that party has not met its "heavy" burden to prove a common law marriage, since he or she does not enjoy any presumption based on evidence of constant cohabitation and reputation of marriage.[8] *See Pierce v. Pierce,* 355

8. Even in circumstances where the rebuttable presumption in favor of a common law marriage applies, i.e., where testimony regarding the exchange of *verba in praesenti* is not available to the party claiming a common law marriage, we question the utility of constant cohabitation as an element of that presumption. Cohabitation between unmarried people today does not carry with it the same social taboo as when the

Pa. 175, 181, 49 A.2d 346, 349 (1946) ("[p]roof of reputation and cohabitation could not establish marriage; nor, in the absence of evidence regarding a marriage contract, is it sufficient to warrant a presumption of marital relations").

 Here, we are mindful that the trial court in equitable distribution proceedings, as factfinder, makes determinations concerning the credibility of witnesses and that its conclusions of law based on those determinations will not be disturbed absent an abuse of discretion. *See Brown v. Brown,* 447 Pa.Super. 424, 669 A.2d 969 (1995), *aff'd,* 547 Pa. 360, 690 A.2d 700 (1997). We cannot conclude, based on a review of the record, that the trial court abused its discretion when it determined that Linda failed to prove clearly and convincingly, the existence of the common law marriage contract between her and Theodore. She was unable to recall the specific instance of when she and Theodore said to each other, "we are husband and wife." She admitted that she and Theodore were married in a civil ceremony in 1984, and offered no explanation as to why she thought this civil ceremony necessary. Theodore's counsel sufficiently impeached her on cross-examination regarding the timing of her assertion of a common law marriage, suggesting that she did not raise the issue until it became apparent that Theodore claimed that the structured tort settlement was non-marital property. Her claim of common law marital status in 1978 contradicts her admission that, in the support papers filed in 1993, she indicated that she was "not married" at the time of her daughter's birth. The record as a whole, therefore, supports the trial court's conclusion that Linda's testimony on this issue lacked credibility, and that she failed to prove, by clear and convincing evidence, the establishment of a common law marriage through the exchange of *verba in praesenti* between her and Theodore.

 Nor, in accordance with our holding today, do we find that Linda was entitled to any rebuttable presumption in favor of a common law marriage through evidence of constant

common law marriage doctrine was developed, and is perhaps less indicative of an intent by a man and a woman to be husband and wife than it was fifty or one hundred years ago.

cohabitation and reputation of marriage. As we have stated, that rebuttable presumption applies only when testimony regarding the exchange of *verba in praesenti* is unavailable. *See Estate of Stauffer, supra; Estate of Wagner, supra.* Here, Linda was available to testify, and did testify, concerning the exchange of *verba in praesenti* between her and Theodore. She simply did not do so convincingly, and therefore did not meet her burden.[9]

Accordingly, we reverse the decision of the Superior Court and reinstate the trial court's equitable distribution award.

SAYLOR, J., did not participate in the consideration or decision of this case.

NIGRO, J., files a concurring opinion in which CASTILLE, J., joins.

ZAPPALA, J., concurs in the result.

NIGRO, Justice, concurring.

I concur in the Majority Opinion. However, I would go one step further and advocate the abolition of common law marriage in this Commonwealth, thereby joining the majority of jurisdictions which have recognized the inappropriateness of such an ancient convention in modern times.[1]

**9.** The deed to the residence provided some independent corroborative evidence of Linda's claim, but it is only circumstantial evidence in support of that claim. The deed is not a marriage contract; it is a contract for the conveyance of land. The remainder of her proof of the existence of the common law marriage rested entirely on the credibility of her own testimony at the hearing. Therefore, even if the rebuttable presumption in favor of common law marriage applied, Linda failed to provide sufficient evidence to raise it. She adduced no testimony from anyone in the Staudenmayer's community to show that they had a general reputation for marriage, and she admitted that she never told her immediate family of her supposed common law marriage.

**1.** E.g., the following states are among those which had recognized common law marriage and have since abolished it: California (1895); Illinois (1905); Wisconsin (1917); Missouri (1921); Nebraska (1923); New York (1933); New Jersey (1939); Minnesota (1941); Nevada (1942); Mississippi (1956); Michigan (1957); South Dakota (1959); Florida (1968); Indiana (1986).

I commend to the attention of the Majority the language of the judiciary of sister states urging the abolition of common law marriage.

For example, in the District of Columbia:

[S]uch a status is the product of an antiquated law and inattention to whether there is a need for a change. We ... question whether such an informal and almost uniformly misunderstood status should not be abolished to end creation of such relationships in the future. The considerations which history teaches gave rise to judicial recognition of such informal and unrecorded marital agreements can hardly justify modern day perpetuation. Cost is certainly not prohibitory, and a plethora of public and quasi-public officials are available to solemnize such an important and socially significant occasion. Certainly no one would contend that facilities for recordation are unavailable. Indeed, one might question whether any valid reason exists to encourage and sanction future circumvention of the established and salutary system for formalizing and recording marriages.

*Johnson v. Young,* 372 A.2d 992, 995–96 (D.C.1977) (citing *McCoy v. District of Columbia,* 256 A.2d 908, 910 (D.C.1969)).

In Arkansas, the Supreme Court noted that:

The pioneer conditions which fostered common-law marriage in the United States have disappeared.... The clerk's office is available to all, and none are beyond the sound of church bells. If reason be the life of the law it would appear wise to abolish common-law marriage everywhere in the United States by individual action in the several states in which it still enjoys a tenuous hold, for its continuance seems to promise more abuse than use.

*Orsburn et al. v. Graves,* 213 Ark. 727, 732, 210 S.W.2d 496, 498 (1948).

And in Ohio:

The days of the walking preacher and of the bishop on horseback are long gone. As was stated in *In re Estate of Maynard* [117 Ohio App. 315, 192 N.E.2d 281 (1962)], ...:

'Is it not an amazing fact, that, in a matter which so profoundly affects the dignity and stability of a family institution, society would be slow to take enlightened action? Surely, no legislative reform is more needed than clear and positive statutes declaring such loosely contracted unions null and void.'

*Nestor v. Nestor*, 15 Ohio St.3d 143, 149–50, 472 N.E.2d 1091, 1097 (1984)(Brown, J., dissenting).

More recently, New Jersey reiterated the underlying rationale for the abolishment of common-law marriage:

Inherent in the common law marriage are a non-recognition of the legal process, and a lack of commitment which often gives rise to an impermanent and ephemeral arrangement, such that economic support, let alone dependency, may be withheld randomly. The union, which in the eyes of the public remains an uncertainty, may dissolve at any time.

*Dunphy v. Gregor*, 136 N.J. 99, 120, 642 A.2d 372, 382 (1994).

And, New York reminded us of the impetus behind its abolishment of common law marriage more than six decades ago:

The consensus was that while the doctrine of common law marriage could work substantial justice in certain cases, there was no built-in method for distinguishing between valid and specious claims and, thus, that the doctrine served the state poorly.

*Morone v. Morone*, 50 N.Y.2d 481, 489, 429 N.Y.S.2d 592, 413 N.E.2d 1154, 1157 (1980).

Thus, as marriage is necessarily an affirmative act, and ancient impediments no longer pertain, I would advocate the abolishment of common law marriage in Pennsylvania so that official records, and not the courts, may determine if and when the parties were married.

CASTILLE, J., joins in this Concurring Opinion.