J-A35018-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| CHRISTINE LAYTON, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| DWAYNE DREAKFORD, | |
| Appellee | No. 303 WDA 2014 |

Appeal from the Order entered August 12, 2013,
in the Court of Common Pleas of Butler County,
Civil Division, at No(s): F.C. No. 12-90349-D

BEFORE: BENDER, P.J.E., BOWES and ALLEN, JJ.

MEMORANDUM BY ALLEN, J.: **FILED DECEMBER 29, 2014**

Christine Layton ("Appellant") appeals from the trial court's order dismissing her complaint for divorce against Dwayne Dreakford ("Dreakford"). We affirm.

On May 23, 2012, Appellant filed a complaint in divorce, in which she requested the trial court to determine that she and Dreakford had previously entered into a common law marriage. Appellant also filed a separate complaint for support. In response, on March 13, 2013, Dreakford filed a petition for declaratory judgment, in which, among other things, he denied that a common law marriage existed between the parties. On May 10, 2013, the trial court held an evidentiary hearing at which the parties, as well as Appellant's father, testified.

The trial court made the following findings of fact:

[The parties] met and began dating in 1991. [They] began living together in 1994. The idea of marriage first came up in June of 1997, according to Appellant, after she found out she was pregnant with the parties' first child. She then testified that the parties began telling family members that they intended to be married. Appellant continued to testify that she and [Dreakford] did research on different options they had in order to be married— traditional church wedding, courthouse, or a common-law marriage.

The parties have three children together: [ages fifteen to ten]. In August of 1997, while pregnant with their first child, the couple took a trip to Jamaica. The parties agree that the trip was taken, but differ on the purpose of the trip. Appellant testified that the couple considered the trip to Jamaica to be their honeymoon and that, prior to leaving the country, they exchanged vows whereupon she stated, "I agree to be your Wife now and forever," and [Dreakford] reciprocated. No witnesses were present during this exchange. [Dreakford], on the other hand, testified that there had never been an exchange of vows and that the trip was taken merely as an opportunity for the two to relax before the birth of their first child. Furthermore, [Dreakford] testified that the parties never discussed getting married and that he had never proposed to Appellant.

Appellant further testified that she had consulted a family law attorney who gave her the requirements for a valid marriage, [but] she could not remember the attorney's name. She could not recall details such as the weather in Pittsburgh or Jamaica on the day of her alleged wedding. Prior to their trip to Jamaica, Appellant had a small bridal shower with her co-workers. About a dozen of her co-workers took her out to a restaurant and gave her some small gifts, however, Appellant could not recall all of the names of the women who were present, nor could she recall the name of the restaurant. Similarly, Appellant could not remember the location of the jewelry store where she claimed the couple went to buy wedding rings, nor could she recall any of the locations where she and [Dreakford] allegedly celebrated their anniversaries. The Court finds that Appellant was not credible.

Appellant's father, Mr. Layton, testified that, subsequent to the trip to Jamaica, he found out about the parties' marriage from Appellant. He did not have knowledge as to where the parties exchanged their vows. It was Mr. Layton's testimony that, after the parties' trip to Jamaica, their family did not believe the parties were just boyfriend and girlfriend anymore. Lastly, Mr. Layton testified that he holds himself out to be [Dreakford's] father-in-law.

By March or April of 1998, the parties moved to North Carolina. During [Dreakford's] testimony, he stated that he believed that by law once he lived with Appellant for seven years, they were married. Therefore, they held themselves out to family members as being married, but they did not start doing that in 1997, as [] Appellant had testified. As to the wedding rings, [Dreakford] asserted that he purchased a ring for Appellant for Christmas of 2000. Appellant picked out her own ring from White Hall Jewelers in St. Augustine, Florida. [Dreakford] testified that the rings were attributed to the fact that the parties had been telling co-workers and people that they were married. Two rings were produced to the Court by Appellant—one square-cut diamond ring and one plain, thin gold band.

The parties began filing taxes "married filing jointly" in 1998 for the 1997 tax year, even though, at that point in time, [Dreakford] did not believe the parties to be married. Appellant [and Dreakford both] enrolled in a Jackson Hewitt tax preparation course to "ensure that the federal government would recognize a common law marriage." [Appellant] did not attend any preparation courses until after the parties returned from Jamaica. [Dreakford] testified that the purpose for enrolling in the course was to earn extra income by having the ability to prepare tax returns. He did not finish the course. He never spoke to a tax professional because he felt Appellant was a professional after she completed the tax preparation course. Appellant advised [Dreakford] that, if the parties filed their taxes jointly, they would be able to save money, and that is what they decided to do.

Moreover, [Dreakford] testified that he avoided questions in regards [sic] to an anniversary date because

he did not know when their anniversary was, as they did not have a wedding date because they never had a wedding.

The parties purchased their home together in North Carolina, whereby [Dreakford] listed Appellant as his wife. When the parties moved to Winston-Salem, North Carolina, [Dreakford] also added Appellant to his health insurance and benefits plan that he received from work. He testified that he felt this was appropriate since they were already filing their taxes jointly. Likewise, [Dreakford] testified that the parties "almost certainly" had joint car insurance from 1998 forward.

Trial Court Opinion, 7/21/14, at 2-5 (footnotes omitted).

At the conclusion of the hearing, the trial court issued an order requiring the parties to submit legal briefs on the status of common law marriage in Pennsylvania. By order entered August 12, 2013, the trial court struck Appellant's divorce action and dismissed her divorce complaint against Dreakford with prejudice.[1] The trial court further ordered the separate support complaint filed against Dreakford dismissed with prejudice. This appeal follows. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises the following issues:

I. Did the trial court err and abuse its discretion in determining that no common law marriage existed despite the overwhelming evidence otherwise and both [parties'] testimony that they believed they were married.

_____

[1] The Butler County Prothonotary did not docket this order properly until January 24, 2014. Thus, the instant appeal is timely.

- 4 -

II. Did the trial court err and abuse its discretion in not admitting certain marital documents that the [parties] drafted together, and was the error harmless.

III. Did the trial court err in limiting the testimony on the discussion and steps the [parties] took when attempting to divide the assets they believed to be marital.

Appellant's Brief at 5 (emphasis removed).[2]

In ***Staudenmayer v. Staudenmayer***, 714 A.2d 1016 (Pa. 1998), our Supreme Court addressed the concept and continued viability of "common law" marriage in Pennsylvania:

> Marriage in Pennsylvania is a civil contract by which a man and woman take each other for husband and wife. There are two kinds of marriage: (1) ceremonial; and (2) common law. A ceremonial marriage is a wedding or marriage performed by a religious or civil authority with the usual or customary ceremony or formalities.
>
> Because claims for the existence of a marriage in the absence of a certified ceremonial marriage present a fruitful source of perjury and fraud, Pennsylvania courts have long viewed such claims with hostility. Common law marriages are tolerated, but not encouraged. While we do not today abolish common law marriages in Pennsylvania we reaffirm that claims for this type of marriage are disfavored.

***Staudenmayer***, 714 A.2d at 1019-20 (citations omitted).

---

[2] Appellant acknowledges her third issue was not preserved by raising a timely objection, and therefore concedes this issue is waived. ***See*** Appellant's Brief at 5. She provides no argument in support of this waived claim.

In 2004, the Pennsylvania legislature amended the Domestic Relations Code, effective January 24, 2005, with regard to "common law" marriages, as follows:

### § 1103. Common-law marriage

No common-law marriage contracted after January 1, 2005, shall be valid. Nothing in this part shall be deemed or taken to render any common-law marriage otherwise lawful and contracted on or before January 1, 2005, invalid.

23 Pa.C.S.A. § 1103. Given its clear terms, the abolition of common law marriage in Pennsylvania applied only prospectively. Thus, parties claiming to have entered into a common law marriage prior to January 1, 2005, would have to establish the existence of a valid marriage contract. In *Staudenmayer*, our Supreme Court clarified the burden of proving a common law marriage as follows:

A common law marriage can only be created by an exchange of words in the present tense, spoken with the specific purpose that the legal relationship of husband and wife are created by that.

\*\*\*

The common law marriage contract does not require any specific form of words, and all that is essential is proof of an agreement to enter into the legal relationship of marriage at the present time.

The burden to prove the marriage is on the party alleging the marriage, and we have described this as a heavy burden where there is an allegation of common law marriage. When an attempt is made to establish a common law marriage without the usual formalities, the claim must be viewed with great scrutiny.

Generally, words in the present tense are required to prove common law marriage. Because common law marriage cases arose most frequently because of claims for a putative surviving spouse's share of an estate, however, we developed a rebuttable presumption in favor of a common law marriage where there is an absence of testimony regarding the exchange of *verba in praesenti*. When applicable, the party claiming a common law marriage who proves: (1) constant cohabitation; and (2) a reputation of marriage which is not partial or divided but is broad and general, raises the rebuttable presumption of marriage. Constant cohabitation, however, even when conjoined with general reputation are not marriage, they are merely circumstances which give rise to a rebuttable presumption of marriage.

**Staudenmayer**, 714 A.2d at 1020-21 (citations and footnotes omitted).

The high court further addressed whether the rebuttable presumption arises in the factual circumstances "when both parties are alive and able to testify regarding the formation of the marriage contract." **Staudenmayer**, 714 A.2d at 1021. Our Supreme Court explained:

We have stated that the rule which permits a finding of marriage duly entered into based upon reputation and cohabitation alone is one of necessity to be applied only in cases where other proof is not available. The necessity that would require the introduction of evidence concerning cohabitation and reputation of marriage is the inability to present direct testimony regarding the exchange of *verba in praesenti*. . . . Where there is no such proof available, we held the law permits a finding of a marriage based upon reputation and cohabitation when established by satisfactory proof.

We have not, however, dispensed with the rule that a common law marriage does not come into existence unless the parties uttered the *verba in praesenti*, the exchange of vows in the present tense for the purpose of establishing the relationship of husband and wife. We have allowed, as a remedial measure, a rebuttable presumption in favor of a

- 7 -

common law marriage based on sufficient proof of cohabitation and reputation of marriage where the parties are otherwise disabled from testifying regarding *verba in praesenti*. However, where the parties are available to testify regarding *verba in praesenti*, the burden rests with the party claiming a common law marriage to produce clear and convincing evidence of the exchange of words in the present tense spoken with the purpose of establishing the relationship of husband and wife, in other words, the marriage contract. In those situations, the rebuttable presumption in favor of common law marriage upon sufficient proof of constant cohabitation and reputation for marriage, does not arise.

By requiring proof of *verba in praesenti* where both parties are able to testify, we do not discount the relevance of evidence of constant cohabitation and reputation of marriage. When faced with contradictory testimony regarding *verba in praesenti*, the party claiming a common law marriage may introduce evidence of constant cohabitation and reputation of marriage in support of his or her claim. We merely hold that if a putative spouse who is able to testify and fails to prove, by clear and convincing evidence, the establishment of the marriage contract through the exchange of *verba in praesenti*, then that party has not met its heavy burden to prove a common law marriage, since he or she does not enjoy any presumption based on evidence of constant cohabitation and reputation of marriage.

**Staudenmayer**, 714 A.2d at 1021 (citations and footnotes omitted).

Here, both Appellant and Dreakford were available, and testified about the existence of the marriage contract, *i.e.*, *verba in praesenti*. In her first issue, Appellant asserts that the trial court erred and/or abused its discretion when concluding that no common law marriage existed, given the "overwhelming evidence otherwise," as well as "both parties' testimony that

- 8 -

they believed they were married." Appellant's Brief at 5 (emphasis removed).

When making its factual findings, the trial court expressly stated: "The Court found Appellant's testimony regarding the exchange of *verba de* [sic] *praesenti* not credible and [Dreakford's] testimony credible." Trial Court Opinion, 7/21/14, at 5. The trial court further explained:

> In the instant case, the testimony was contradictory as to whether an express agreement was made. To support her claim that a common law marriage existed, Appellant testified that the parties had a discussion about marriage shortly after she found out she was pregnant with their first child. She testified that the parties had told family members that they were going to be married. Furthermore, she testified that she researched common law marriage as well as reached out to a family law attorney. She, however, did not learn that the parties could declare their intentions before two witnesses, nor could she remember the name of the family law attorney with whom she consulted. Prior to the alleged wedding date, Appellant testified that some friends from work held a bridal shower for her, however, she could not remember the name or specific location of the restaurant in which the bridal shower was held nor the names of friends who attended. Appellant further recounted that, on August [1], 1997, the parties were in their apartment, packing for their trip to Jamaica, when they exchanged vows. She could not testify as to what the weather was like in Pittsburgh on that day.

> [Dreakford], on the other hand, testified that, upon finding out Appellant was pregnant, he merely discussed the pregnancy with her. He stated he was concerned that she would not keep the baby as she had two previous abortions, one of which would have been his child. He further testified that, after the parties concluded that they would keep the baby, their trip to Jamaica was one last chance for the parties to relax as a couple before the birth of their first child.

To further support her claim of common law marriage, Appellant testified that [Dreakford] purchased two "wedding rings" for her after the Jamaica trip. She produced to the Court two rings. It is undisputed that there was not an exchange of rings prior to or during the trip to Jamaica. [Appellant] could not recall the name of the store or any other details around the selection of the rings.

[Dreakford] testified that he purchased rings for the two of them as a Christmas present in 2000 and that the rings were purchased at Whitehall Jewelers in St. Augustine, Florida. Appellant had chosen the ring with the square-cut diamond, which was presented to the Court. [Dreakford] could not testify to the plain, thin gold band produced to the Court by Appellant as he had never seen it before.

The Court found [Dreakford's] testimony that no express words were exchanged between the parties articulating a present intent to enter into the legal relationship of marriage to be credible. The Court found Appellant's contradictory testimony not credible.

Trial Court Opinion, 7/21/14, at 7-8 (footnote omitted).

Because the parties presented contradictory testimony regarding *verba in praesenti*, the trial court next considered evidence of constant cohabitation and reputation for marriage as an aid to its credibility determination. The trial court explained:

The relevant testimony as to this issue was, for the most part, not disputed.

There is no dispute that the parties constantly cohabitated from 1994 to 2011. At the suggestion of Appellant, the parties began filing their taxes as "Married Filing Jointly." [Dreakford] added Appellant to his employment benefits package and his automobile insurance. When the parties purchased a home in North Carolina, [Dreakford] added Appellant to the deed as "his wife."

- 10 -

Mr. Layton, Appellant's father, testified that Appellant informed him the parties got married in Jamaica. He was unable to testify as to whether or not the parties exchanged *verba in praesenti* with the intent to create a marriage. Mr. Layton further testified that [Dreakford] never told him the parties were married, however he has held himself out to be [Dreakford's] father-in-law.

Appellant's testimony was in general verbose. Her specific testimony asserting *verba in praesenti* was not credible. The veracity of the testimony supporting reputation was not sufficient to overcome the credibility issue of *verba in praesenti*. So while there was evidence of constant cohabitation and reputation, there was not clear and convincing evidence of *verba in praesenti*, without which there can be no common law marriage.

In her [Pa.R.A.P. 1925(b) statement], Appellant seems to assert that because both parties "believed they were married" there was sufficient evidence to support a common law marriage. Appellant testified that there was a specific date, time and place where the parties exchanged *verba in praesenti* and, if believed, this occurred in Pennsylvania sometime around August 1, 1997. This would be her basis of "believing" the parties were married. [Dreakford] testified that he "believed" they were married as an operation of law after cohabiting for seven years. In 1998, less than a year after the trip to Jamaica, the parties resided in North Carolina which does not recognize common law marriage. [Dreakford's] "belief" was a mistaken understanding of the law. A mistaken understanding for which he believed he had no remedy until he consulted with an attorney. There is no evidence on the record that [Dreakford] ever intended to enter into a marriage contract.

The Court considered in its analysis that [Dreakford] "believed" he was married. The Court considered that he took certain actions, including, but not limited to, discussions of distribution of property between the parties. However, the Court found no authority to support the formation of a marital contract based upon the mistaken "belief" of a party as to the status of the law (not a mistake of fact). [Dreakford's] testimony as to why he believed the parties were married was credible.

- 11 -

Appellant had a heavy burden of proving by clear and convincing evidence that the parties by their express agreement entered into a common law marriage. As in the *Staudenmayer* case, both parties were "available to testify," and did testify, concerning the exchange of *verba in praesenti*. Appellant "simply did not do so convincingly, and therefore did not meet her burden." [*Staudenmayer*, 714 A.2d at 1022].

Trial Court Opinion, 7/21/14, at 8-10 (footnote omitted).

Our review of the record supports the trial court's conclusions. As recognized by the trial court, because both parties testified at the evidentiary hearing, the rebuttal presumption discussed in *Staudenmayer*, *supra*, does not arise. Moreover, as our Supreme Court further noted in *Staudenmayer*, the trial court "as factfinder, makes determinations concerning the credibility of witnesses and its conclusions of law based on those determinations will not be disturbed absent an abuse of discretion." *Staudenmeyer*, 714 A.2d at 1022. We discern no such abuse of discretion. Thus, we agree with the trial court that, based on the trial court's credibility determinations, Appellant failed to meet her heavy burden of establishing a common law marriage.

In her remaining claim, Appellant asserts that the trial court erred and/or abused its discretion in refusing to admit as exhibits "certain marital documents that the [p]arties drafted together." Appellant's Brief at 5 (emphasis removed). Within her brief, Appellant asserts, "[i]n 2011, Dreakford created and emailed [Appellant] a Separation Agreement and then the parties created a QDRO together, both documents containing August 1,

1997 as the agreed upon date of marriage." Appellant's Brief at 18. According to Appellant:

> The trial court excluded these documents as evidence despite argument that they were an opposing party's admission. Pa.R.E. 803(25). It also appears that had they been admitted, they would have been considered a prior inconsistent statement of Dreakford once he testified. In the Opinion issued by the trial court, it appears that the trial court acknowledges that their exclusion was an error; however, claiming it was harmless.

*Id.* (citations omitted).

Our review of the record refutes Appellant's claim. Initially, we agree with Dreakford's assertion that Appellant's argument regarding this issue is not sufficiently developed. *See* Dreakford's Brief at 19. As noted by the trial court, in her Pa.R.A.P. 1925(b) statement, Appellant failed to specifically identify the specific exhibits to which she refers. Moreover, Appellant's appellate brief is devoid of case authority and any pertinent discussion of the Pennsylvania Rules of Evidence. Thus, Appellant's claim is waived. *See generally*, *Lawson v. Lawson*, 940 A.2d 444, 448 n.5 (Pa. Super. 2007).

Even absent waiver, Appellant's claim fails. "[T]he admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Smith v. Morrison*, 47 A.3d 131, 137 (Pa. Super. 2012). At the evidentiary hearing, the trial court refused to admit the documents at issue because Dreakford denied he had drafted certain parts of them. *See* N.T., 10/25/13,

- 13 -

at 53-57. "The ultimate question is whether the authentication testimony is sufficiently complete so as to persuade the [trial] court that it is improbable that the original item has been exchanged with another or altered in any material respect." **Webb v. Commission (PennDot)**, 934 A.2d 178, 185 (Pa.Cmwlth. 2007) (citation omitted). Moreover, "[t]estimony of a witness with personal knowledge that a matter is what it is claimed to be **may** be sufficient to authenticate the evidence." **Id.** (citing Pa.R.E. 901(b)(1)) (emphasis added). Here, because there was argument that the email at issue was "editable," the trial court refused to admit it into evidence. N.T., 10/25/13, at 53. In other words, the trial court believed Appellant's testimony did not sufficiently authenticate it. As noted **supra**, the trial court repeatedly stated that Appellant's testimony was not credible. Thus, as stated by the trial court, even had the exhibits been admitted, they would not alter the trial court's conclusion that "the credible facts showed that no vows were exchanged, and [Dreakford] never had an intent or purpose to create a legal relationship of husband and wife[.]" Trial Court Opinion, 7/21/14, at 11.

In sum, because the record supports the trial court's conclusion that Appellant did not meet her burden of proving that a common law marriage existed between the parties, we affirm the trial court's order striking and dismissing her divorce complaint with prejudice.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/29/2014</u>