J-A15030-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| DIANE M. MILLER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| KEVIN J. BROWN | |
| | No. 1992 MDA 2016 |

Appeal from the Order Entered November 8, 2016
In the Court of Common Pleas of Susquehanna County
Civil Division at No(s): 2016-00275

BEFORE: MOULTON, J., SOLANO, J., and MUSMANNO, J.

MEMORANDUM BY SOLANO, J.: **FILED NOVEMBER 07, 2017**

Appellant Diane M. Miller appeals from the order dismissing her divorce action against Appellee Kevin J. Brown and declaring that no common law marriage exists between the parties. We affirm.

On March 21, 2016, Miller filed a complaint in divorce. The complaint alleged that the parties were married at common law on August 28, 2002,[1] and contained additional counts for alimony and equitable distribution of marital property. Brown filed an answer which denied that the parties were married and petitioned the court for a declaratory judgment that the parties were not married.[2]

---

[1] Common law marriages entered after January 1, 2005 are not valid in Pennsylvania, but the Commonwealth recognizes such marriages that were entered prior to that date. 23 Pa.C.S. § 1103; *Vignola v. Vignola*, 39 A.3d 390, 392-93 (Pa. Super.), *appeal denied*, 50 A.3d 126 (Pa. 2012).

[2] Brown filed the petition pursuant to 23 Pa.C.S. § 3306, which states:
*(Footnote Continued Next Page)*

The trial court held a hearing on October 25, 2016, at which both parties testified and presented documentary evidence. The testimony established that the parties became romantically involved in May 1994, and began living together in August 1994. Shortly thereafter, Miller became pregnant with the couple's only biological child, Rebecca (born in June 1995). According to Miller, Brown was still legally married to another woman at that time.[3] The parties continued to live together and shared finances until April 2016, with only two brief intervening periods of separation (one 3-month separation and one 3-week separation). After a few years, the parties began introducing each other as spouses, and family and friends treated the parties as if they were a married couple.

As discussed below, the controlling question that determines whether a couple entered into a common law marriage is whether the parties exchanged words expressing their mutual present intent to marry and thereby formed an oral contract of marriage. *See Staudenmayer v.*

(Footnote Continued) ————————————

When the validity of a marriage is denied or doubted, either or both of the parties to the marriage may bring an action for a declaratory judgment seeking a declaration of the validity or invalidity of the marriage and, upon proof of the validity or invalidity of the marriage, the marriage shall be declared valid or invalid by decree of the court and, unless reversed upon appeal, the declaration shall be conclusive upon all persons concerned.

23 Pa.C.S. § 3306.

[3] The record contains no information about Brown's other marriage or when (or if) it terminated, except that in 2002 Brown signed a questionnaire stating that he was legally divorced at that time.

- 2 -

***Staudenmayer***, 714 A.2d 1016, 1020 (Pa. 1998).[4] With respect to that question, Miller testified:

> Q: At some point did you and Mr. Brown discuss marriage?
>
> A: We had discussed it, yes.
>
> Q: At what point did you begin discussing marriage?
>
> A: After I got pregnant with Rebecca we had discussed it.
>
>     . . .
>
> Q: When did Mr. Brown express to you his intent to be your . . . husband?
>
> A: When I was pregnant with Rebecca.
>
> Q: Did he not ask you [to] marry him and you refused?
>
> A: I never refused to marry Kevin.
>
> Q: Didn't you tell him that it was just a piece of paper, that it wasn't necessary?
>
> A: That's not a refusal. I did say that it's just a piece of paper. I never refused to marry Kevin.
>
>     . . .
>
> Q: . . . When did you utter the words to [Brown] that you intended to be his wife forever going forward?
>
> A: I never recited those exact words.
>
> Q: Did Mr. Brown ever tell you that he intended to be your husband —
>
> A: Yes, he did.
>
> Q: [G]oing forward?

---

[4] These words are often referred to as "*verba in praesenti*."

A: Not in those exact words, no.

Q: When?

A: I don't have an exact date. . . .

When I had Rebecca we had discussed getting married. When . . . I was pregnant with Rebecca[,] Kevin was still legally married to another person.

N.T., 10/25/16, at 4-5, 30, 38-39.

According to Brown, he never said to Miller that he "considered [himself] married to her from that point forward" and the couple had never "done the equivalent of exchanging words of present intent to go forward as husband and wife." N.T. at 48-49. Brown testified that he had asked Miller to marry him several times, but that she "refused"; she did not "outright say no," but responded that "it's just a piece of paper." *Id.* at 48, 51. One of the times he proposed was in 1995, after their daughter was born. *Id.* at 52. Brown also stated that he gave Miller a two-piece diamond ring, "[l]ike an engagement ring," at some point before 2002. *Id.* at 71-72. Brown testified that he would introduce Miller as his wife because "[i]t was quite embarrassing I guess to meet someone and say yeah, she's my girlfriend for 23 years, you know." *Id.* at 50.

Miller entered into evidence a document titled "Affidavit Attesting to the Existence of Common Law Marriage," which the parties executed on August 28, 2002. The affidavit was required by Brown's employer, the

Pennsylvania Department of Transportation, in order to add Miller to Brown's health insurance policy. The affidavit contained the following language:

> We . . . do hereby affirm that we have expressly agreed to and entered into a common law marriage.
>
> Pursuant to this common law marriage, we established the relationship of husband and wife.
>
> We hold ourselves out to the community as husband and wife, and have cohabitated for 8½ years.
>
> We each sign this affidavit as evidence of our mutual agreement, and with the understanding that it may be used as evidence of our marriage contract. We agree to provide the Trustees of the Pennsylvania Employees Benefit Trust Fund with any additional information that may be required as proof of our marriage.

*See* Miller's Ex. 6. Brown signed the document in the parties' home in Miller's presence, and Miller thereafter took the document to a notary public and signed the document in the presence of the notary.

Miller testified that the parties signed the affidavit "so we could prove that we were marri[ed] for the health insurance," and because "it was proof of our being married at that point." N.T. at 20-21. Miller also stated "this was the first opportunity we had to consider ourselves common law . . . on paper." *Id.* at 30; *see also id.* at 45. At the same time, Miller testified that she considered Brown and herself to be husband and wife prior to signing the affidavit. *Id.* at 31, 45.

Brown testified that he signed the affidavit strictly to get health insurance benefits for Miller and their daughter. N.T. at 47-48, 56-57. Brown testified that because he had left it to Miller to sign the document before a

notary, he joked with Miller that he had "missed the wedding. You know. This was our wedding." *Id.* at 56. Brown testified that he did not consider he and Miller to be husband and wife upon signing the affidavit, *id.* at 48, but that they "probably did consider each other husband and wife," beginning some time after they signed the affidavit. *Id.* at 55-56. When asked, "when you signed [the affidavit] you knew that it would be used to prove you were married, correct?," Brown responded, "Correct." *Id.* at 63.

Other documents introduced into evidence showed that in 2014 and 2016, Brown withdrew a portion of his retirement funds. To do so, Brown signed and notarized a form which states, "I am married or consider myself married under common law," and Miller signed and notarized a "consent of spouse."

The couple filed federal tax returns separately as single persons (not as married persons filing separately) through 2014; their 2015 federal tax return was filed jointly as married. Miller testified that she had worked for an accountant and knew that married couples could file separate returns, but that the couple made the joint decision to file separately as single persons for economic reasons until 2015. N.T. at 35-37, 41, 43-44.

Each party lists the other person as the primary beneficiary on his or her respective pension plan. The parties own a house together, which they purchased in 2002; the ownership is as "Joint Tenants with the Right of Survivorship, and not as Tenants in Common." In 2008, the couple entered into an oil and gas lease for their real property. A hand-written notation on

the lease, not written by either party, states that the parties are "husband and wife"; the parties' testimony conflicted regarding whether that notation existed before or after they signed the lease. N.T. at 15, 66.

On November 8, 2016, the court issued an order declaring that no common law marriage existed, and dismissing Miller's complaint with prejudice. The court explained:

> The parties admitted that they never recited or exchanged any exact words relative to their intent to effectuate a common law marriage. . . .
>
> In this case, there is no evidence – let alone clear and convincing evidence – that the parties ever exchanged *verba in praesenti*. Miller and Brown both testified that they treated each other as husband and wife, that they considered each other to be husband and wife, that the members of the community considered them to be husband and wife, but there was absolutely no evidence that they ever exchanged any present sense words to each other with the settled intent of establishing a marital contract. In this regard, the evidence regarding cohabitation and general community reputation is not even considered until such time as the parties testify to the exchange of *verba in praesenti*. In this case, both parties clearly testified that there was never a moment during their long relationship where they uttered the necessary and essential words in the present tense expressing their commitment and intent to enter into a common law marital union.
>
> Miller relies heavily upon the Pennsylvania Department of Transportation's "Affidavit of Common Law Marriage" and utilizes the date of that document for purposes of establishing the date of the parties' marriage. (Plf. Ex. 6.) While the parties testified that they discussed the "Affidavit of Common Law Marriage," there was no testimony that any *verba in praesenti* were exchanged prior to execution of that document. Moreover, the testimony is equally clear that the parties did not even execute the document in each other's presence; rather, it was executed by each party at separate times and separate locations. In the absence of *verba in praesenti*, the mere existence of the "Affidavit of Common Law Marriage" does not create a valid

common law marriage. ***See Bell*** [***v. Ferraro***], 849 A.2d [1233,] 1235 [(Pa. Super. 2004)] (finding that execution of "Affidavit of Common Law Marriage" necessary to place "spouse" on health insurance was insufficient to demonstrate existence of common law marriage where there was not clear and convincing proof of *verba in praesenti*); ***see also Perrotti v. Meredith***, 868 A.2d 1240, 1245 (Pa. Super. [] 2005) ("Having failed to sustain the initial burden of proving the v*erba in praesenti* requirement, we conclude that the purported wife's other evidence did not []rehabilitate her failure to prove *verba in praesenti*, no matter how weighty or compelling that evidence may have been.").

Trial Ct. Op., 11/8/16, at 4, 6-7 (footnotes and original brackets omitted).

In a footnote, the court analogized the present case to ***Bell***. In ***Bell***, the purported wife testified that the parties had exchanged words of present intent at the time the couple executed an Affidavit of Common Law Marriage. 849 A.2d at 1234-35. The purported husband testified that the affidavit was executed solely for obtaining health insurance benefits. ***Id.*** at 1235. The trial court credited the purported husband's testimony over that of the purported wife. ***Id.*** On appeal, this Court found that the affidavit constituted rebuttable evidence of a common law marriage, but that the facts stated within any notarized document may be contradicted by other evidence. ***Id.*** Because the trial court had credited the purported husband's testimony, we affirmed the trial court's conclusion that the affidavit was not dispositive and that no marriage existed. ***Id.*** Here, the trial court concluded —

Like ***Bell***, the record demonstrates that the parties executed the "Affidavit of Common Law Marriage" in order to add Miller to Brown's health insurance policy. Unlike ***Bell***, where there was at least one party contending that *verba in praesenti* were exchanged, no such testimony or evidence was adduced on the record in this case.

- 8 -

Trial Ct. Op. at 7 n.5.

Miller appealed on December 7, 2016, and raises the following issues:

1. Did [Miller] present clear and convincing evidence that a common law marriage existed between the parties?

2. Did the trial court commit an error of law by dismissing the divorce action filed by [Miller] and finding that a common law marriage did not exist between the parties?

3. Did the trial court abuse its discretion by dismissing the divorce action filed by [Miller] and finding that a common law marriage did not exist between the parties?

Miller's Brief at 3 (suggested answers omitted).

When reviewing a declaratory judgment regarding the existence of a common law marriage,

we are limited to determining whether the trial court clearly abused its discretion or committed an error of law. If the trial court's determination is supported by the record, we may not substitute our own judgment for that of the trial court. The application of the law, however, is always subject to our review.

*Vignola*, 39 A.3d at 393 (citation omitted).

Miller argues that the affidavit and other documents attesting to the existence of a common law marriage are clear and convincing evidence that, along with the evidence of continuous cohabitation and reputation of marriage, should have been considered by the trial court as proof that the parties were married, despite the lack of clear testimony that they exchanged words of present intent. Miller's Brief at 8-10. Miller claims that: under *Bell*, the affidavit acts as *prima facie* evidence of the common law marriage; the testimony of Miller proves that the affidavit was signed for the

purpose of establishing a legal marriage contract between the parties; and the testimony of Brown did not rebut this assertion because he admitted that he signed the affidavit. *Id.* at 11-12. Miller points out that, although Brown testified that he signed the affidavit only for insurance purposes, he also testified that he had joked with Miller that signing the affidavit had been their "wedding." Miller argues that, "[i]f [Brown] considered the signing of an affidavit the same as a wedding, that is the same as expressing his intent to be married at common law." *Id.* at 13. At the same time, Miller states that, "[s]ince they had no marriage license, the parties needed a tangible written document to confirm the existence of their common law marriage, which they had already entered into some years prior." *Id.* at 11-12. Though she acknowledges that she did not sign the affidavit in the presence of Brown, Miller contends that "[t]here is no legal requirement that the parties acknowledge their intent to be husband and wife in the presence of each other when their expression of intent is in writing." *Id.* at 13.

Our Supreme Court has most recently addressed proof of common law marriage as follows:

> A common law marriage can only be created by an exchange of words in the present tense, spoken with the specific purpose that the legal relationship of husband and wife is created by that [exchange]. Regarding this requirement for an exchange of words in the present tense, this Court has noted:
>
> > [I]t is too often forgotten that a common law marriage is a marriage by the express agreement of the parties without ceremony, and almost invariably without a witness, by words — not in futuro or in postea, but — in praesenti,

- 10 -

uttered with a view and for the purpose of establishing the relationship of husband and wife.

The common law marriage contract does not require any specific form of words, and all that is essential is proof of an agreement to enter into the legal relationship of marriage at the present time.

The burden to prove the marriage is on the party alleging a marriage, and we have described this as a heavy burden where there is an allegation of a common law marriage. When an attempt is made to establish a marriage without the usual formalities, the claim must be reviewed with great scrutiny.

. . .

. . . Where there is no [proof of *verba in praesenti*] available,[5] we [have] held, the law permits a finding of marriage based upon reputation and cohabitation when established by satisfactory proof.

We have not, however, dispensed with the rule that a common law marriage does not come into existence unless the parties uttered the *verba in praesenti*, the exchange of words in the present tense for the purpose of establishing the relationship of husband and wife. . . . [W]here the parties are available to testify regarding *verba in praesenti*, the burden rests with the party claiming a common law marriage to produce clear and convincing evidence of the exchange of words in the present tense spoken with the purpose of establishing the relationship of husband and wife, in other words, the marriage contract. . . .

By requiring proof of *verba in praesenti* where both parties are able to testify, we do not discount the relevance of evidence of constant cohabitation and reputation of marriage. When faced with contradictory testimony regarding *verba in praesenti*, the party claiming a common law marriage may introduce evidence

---

[5] This situation would typically occur after one spouse is deceased, and the other is prevented from testifying by the Dead Man's Act's prohibition of testimony by a surviving adverse party that is contrary to the decedent's interest. **See Staudenmayer**, 714 A.2d at 1020 n.7; **see generally Schroeder v. Jaquiss**, 861 A.2d 885, 889 (Pa. 2004) (discussing Dead Man's Act).

- 11 -

of constant cohabitation and reputation of marriage in support of his or her claim. We merely hold that if a putative spouse who is able to testify [] fails to prove, by clear and convincing evidence, the establishment of the marriage contract through the exchange of *verba in praesenti*, then that party has not met its heavy burden to prove a common law marriage, since he or she does not enjoy any presumption based on evidence of constant cohabitation and reputation of marriage.

***Staudenmayer***, 714 A.2d at 1020–21 (internal quotation marks, citations, and footnote omitted).

In this case, Miller had the burden to prove by clear and convincing evidence that words stating a present intent to marry were exchanged between the parties. ***Staudenmayer***, 714 A.2d at 1021. The trial court found that Miller failed to sustain this burden, and the record supports that conclusion. Miller herself testified that no such exchange of words occurred. ***See*** N.T. at 38-39.[6] Brown also testified that the necessary exchange never took place. ***Id.*** at 48-49. Had the parties presented contradictory testimony regarding the *verba in praesenti*, then the court would have been permitted to examine supplementary evidence of constant cohabitation and reputation of marriage; but here, no clear evidence of the necessary exchange of words was presented by either party. The court therefore was correct not to consider co-habitation or reputation evidence and to conclude that there was

---

[6] According to Miller's testimony, the closest the couple came to having such an exchange took place while Brown was still married to his previous wife. ***See*** N.T. at 39. Because Brown was already married to someone else at that time, those statements could not give rise to a common law marriage between him and Miller. ***See Cann v. Cann***, 632 A.2d 322, 324-25 & 324 n.1 (Pa. Super. 1993).

- 12 -

insufficient evidence of the marriage. ***See Perrotti***, 868 A.2d at 1245 (holding that when both parties testified, but neither testified that *verba in praesenti* had been exchanged, supplementary evidence provided by wife, including documents signed by the parties which referenced them as husband and wife, could not rehabilitate wife's claim of common law marriage).

Miller is correct that the Transportation Department affidavit could serve as evidence of the existence of a marriage. ***See Bell***, 849 A.2d at 1234-35. However, it is not dispositive proof. ***Id.*** It does not overcome Miller's own lack of testimony establishing an exchange of words showing entry into a marriage. Moreover, Brown testified that no *verba in praesenti* were exchanged surrounding the signing of the affidavit, and that he signed the document solely for insurance purposes. The trial court credited this testimony. Brown's joke that the signing of the affidavit "was [their] wedding," does not show that a verbal promise between the parties ever took place. No contract to enter into common law marriage holds weight in Pennsylvania where that contract is not supported by *verba in praesenti*.[7]

Because the trial court did not abuse its discretion or err as a matter of law, we affirm the order below.

_____

[7] To the extent that Miller argues that the affidavit embodies the necessary exchange of words, we disagree. Even if such a document could suffice to satisfy the *verba in praesenti* requirement, it would have to include an exchange of words in the present tense. ***Perrotti***, 868 A.2d at 1243. The language of the affidavit is in the past tense.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/7/2017