J-A32013-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| SHERRILYN D. WASHINGTON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HARRY E. HAMILTON | : | No. 124 MDA 2017 |

Appeal from the Order Entered December 1, 2016
In the Court of Common Pleas of Centre County
Civil Division at No(s):  04-2534

BEFORE:   OTT, J., DUBOW, J., and STRASSBURGER[*], J.

MEMORANDUM BY OTT, J.:                    **FILED SEPTEMBER 12, 2018**

Sherrilyn D. Washington ("Wife") appeals from the trial court's equitable distribution order entered December 1, 2016, and as amended by the court on February 1, 2017.  A divorce decree was previously entered on July 11, 2013, between Wife and Harry E. Hamilton ("Husband").[1]  Wife challenges various aspects of the equitable distribution decision.  Based on the following, we affirm.

The facts and procedural history are well known to the parties. Accordingly, we summarize as follows:  On June 8, 2004, Wife filed a

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1]  Husband represented himself at the trial court level and in this appeal. However, he did not file an appellee's brief.

complaint in divorce, alleging that the parties were married in the Bahamas on June 1, 1996.[2] On April 27, 2005, the trial court entered an order, finding that a valid common law marriage existed between the parties as of November 7, 2000. Wife filed a petition for bifurcation of the economic issues from the divorce action on January 17, 2013.

On July 11, 2013, the court issued a divorce decree on the grounds of irretrievable breakdown (parties having lived separate and apart for at least two years) pursuant to 23 Pa.C.S. § 3301(d). On August 10, 2013, Husband filed an appeal, alleging, *inter alia*, the court erred by entering a divorce decree because the parties were never married. A panel of this Court upheld the trial court's determination that a common law marriage existed, stating: "[W]e find no abuse of discretion in its determination that the parties formed a common law marriage 'by an exchange of words in the present tense, spoken with the specific purpose that the legal relationship of husband and wife [was] created.'" ***Washington v. Hamilton***, 118 A.3d 455 [857 MDA 2013, 1582 MDA 2013] (Pa. Super. 2015) (unpublished memorandum at 6), *quoting* ***Staudenmayer v. Staudenmayer***, 714 A.2d 1016, 1020 (Pa. 1998).[3]

_____

[2] In her complaint, Wife also sought, *inter alia*, custody of the parties' son, who was born in August of 2001.

[3] Husband did not file a petition for allowance of appeal with the Pennsylvania Supreme Court.

- 2 -

The matter then proceeded to issues concerning separation and equitable distribution. However, Husband filed a motion to vacate judgment of marriage pursuant to 23 Pa.C.S. § 3332, and an amended petition on November 17 and 18, 2016, respectively.[4]

On November 21, 2016, the trial court entered two orders concerning the matter. The first ("equitable distribution order") provided: "AND NOW, November 21, 2016, [Husband has] been given an opportunity to present more testimony and having failed to do so, these proceedings are terminated and the Court will issue in due course a Final Order with regard to equitable distribution." Order, 11/21/2016.[5] The second order ("motion to vacate marriage judgment order") set forth the following, in pertinent part: "[Husband] seeks to vacate the judgment of marriage entered in this matter. This issue has been resolved by the Appellate Courts of Pennsylvania and the Motion to Vacate Judgment of Marriage is denied." Order, 11/21/2016.[6] Husband then filed a notice of appeal from "the order praeciped for entry in

_____

[4] In these practically identical petitions, Husband alleged: "[P]ursuant to 23 Pa.C.S. [§] 3332, the consequence of the deciding jurist conducting an electronic search for a marriage license in Colorado is [Husband] is denied a fair trial concerning the establishment of a common law marriage." Motion to Vacate Judgement [sic] of Marriage in Case Number 04-0339 Pursuant to 23 Pa.C.S. 3332, 11/17/2016, at unnumbered 1.

[5] The equitable distribution order was timestamped on December 5, 2016.

[6] The motion to vacate marriage judgment order was also timestamped on December 5, 2016.

this matter on the 21st day of November 2016," but did not specify which order

he meant.  Notice of Appeal and Under Pa.R.A.P. 2154 and 1923, 11/21/2016.

On December 1, 2016, the trial court entered a decree[7] regarding the

outstanding economic issues, stating:

> This litigation has been the most frustrating challenge this Judge has faced in a fifty year legal career.  Husband has inundated the Court (and the Appellate Courts) with petitions and appeals.  Husband has refused to accept decisions affirmed by the Appellate Courts and has refused to cooperate with this Judge in establishing values for the limited marital assets in dispute.  As noted in a previous order, we have accepted the calculations of value made by Wife as a sanction for Husband's lack of cooperation.  Because Wife has waived any claim for permanent alimony, the only issue before us is equitable distribution.
>
> By Order entered April 27, 2005, Judge David Grine of this Court found that "A valid common law marriage existed between Plaintiff and Defendant as of November 7, 2000."  Our preliminary task, therefore, is to determine the date of separation.  Husband contends there was no separation, because the parties were in effect "separated" on November 7, 2000 the date Judge Grine determined their marriage began.  Wife contends the date of separation was 2004, when she filed for divorce.
>
> While Wife testified that she filed for divorce in 2004 because "she found out about [Husband's other son] for sure," she acknowledged that the parties stopped marital relations after the birth of their son … on August [], 2001.  It is clear to us based on a fair consideration of all the testimony, that Wife stopped any voluntary relationship with Husband after the birth of Husband's other son … on September [], 2001, less than a month after the birth of the parties' child.  While Husband apparently "dropped in" from time to time at the Lemont home, we accept Husband's representation that those visits were solely for the purpose of seeing the parties' son.  We find, therefore, that this date of separation is November 2001.

---

[7] The decree was timestamped on December 5, 2016.

- 4 -

## MARITAL ASSETS

### A. PERSONAL PROPERTY

Wife continued to reside in the Lemont property for several years after the date of separation. When she left that property, she took with her what personal property she believed appropriate. No attempt was made to value items of personal property and presumably such property no longer exists.

### B. LEMONT REAL ESTATE

Husband owns a property in Lemont, Centre County, Pennsylvania. Because of Husband's refusal to cooperate in attempting to value assets, we have accepted Wife's submission with respect to the valuation. Wife calculates the increase in the value of the Lemont property between 2000 and 2004 at Forty Thousand Five Hundred Two Dollars ($40,502.00). Because we have found the marriage only lasted one year for equitable distribution purposes, we value the Lemont property at Ten Thousand One Hundred Twenty-Five Dollars ($10,125.00).

### C. NEW JERSEY PROPERTY

Similarly, with respect to the home in Long Branch, New Jersey, Wife calculated the four year increase in value at Twenty-Three Thousand Nine Hundred Thirty-Five Dollars ($23,935.00). We value the Long Branch property at Five Thousand Nine Hundred Eighty-Four Dollars ($5,984.00).

### D. NFL PENSION

Husband's career in the NFL ended prior to the date of marriage. As best we understand the evidence, Husband did not begin receiving benefits until after the date of separation. No definitive evidence was presented with regard to any increase in value between 2000 and 2001 in Husband's NFL Pension. Because of the brief length of the marriage, we find Wife is not entitled to any portion of Husband's pension or any future recovery under pending concussion litigation.

### STATUTORY FACTORS

1.  As previously discussed, we are bound by Judge Grine's determination that the marriage occurred on November 7, 2000 and we have found that the separation occurred in the fall of 2001.

2.  Wife was not previously married.  It is unclear from the record how many times Husband has been married; in fact, it appears Husband may well have been married to several different women during his marriage to Wife.

3.  Wife is fifty-one (51) years of age, a graduate of Penn State University with serous health issues linked to the stress caused by this litigation.  Wife is a paraprofessional in the State College School District earning Thirteen Thousand Dollars ($13,000.00) per year with vision, dental and medical insurance.  Wife also receives an Eight Hundred Thirty-Six Dollar ($836.00) per month military pension.  Husband is approximately fifty-two (52) years of age, in good health and receives at least Two Thousand One Hundred Ninety-Three Dollars and Thirty-Four Cents ($2,193.34) per month as an NFL Pension.  Husband receives health insurance through the Federal Government and has an earning capacity of at least Seventy-Five Thousand Dollars ($75,000.00) per year based upon his prior positions with the United States.  We reject as totally unproven, Husband's contention that he is incapable of continuing his career with the United States or securing similar employment.

4.  Wife was the homemaker while she resided in Lemont with the parties' child.  Husband made virtually no contribution toward the marriage.

5.  Husband is an attorney who perhaps is and certainly could be employed earning significant income.  Wife is currently a teacher's assistant but it is unclear why she has not been able to advance in her chosen field.

6. Both parties have health insurance through their employers.  Husband has an outstanding claim through the NFL concussion litigation to substantially increase his income and could increase his income should he chose [sic] to return to the workforce assuming he has not currently done so.

7.  Wife did not contribute to the marital property which is the subject of this distribution, both pieces of real estate having been

owned by Husband prior to the marriage. Husband has "dissipated" the marital assets by prolonging this litigation.

8. No property has been "set–apart" to the other party.

9. It is difficult to understand Husband's "standard of living" based upon his refusal to forthrightly answer any questions posed to him. Wife's standard of living is significantly lower currently, mainly because she now has six year old twin daughters residing with her.

10. Wife's economic circumstances are dire. Husband's economic circumstances are much better than he acknowledges.

11. While Wife make[s] a brief argument regarding federal income tax, we are not satisfied any evidence has been presented as to the tax effect of any distribution.

12. No expense of sale will be incurred by Wife

13. Currently Husband has temporary custody of the parties' child, age 14.

While Wife argues otherwise, we are only able to calculate marital assets for distribution purposes in the amount of Eleven Thousand One Hundred Nine Dollars ($11,109.00). While Wife has suggested awarding her sixty-five percent (65%) of those marital assets, we believe she is entitled to one hundred percent (100%) of those assets based upon Husband's conduct throughout this litigation resulting in substantial delay in the receipt by Wife of her equitable share. We will, therefore, award Wife the sum of Eleven Thousand One Hundred Nine Dollars ($11,109.00). We decline to even consider awarding Wife a share of the real estate because the testimony suggest[s] Husband may no longer own those parcels or they may be so encumbered as to render them valueless or, with respect to the New Jersey property, may have been significantly reduced in value as a result of actions by third parties. Armed with a judgment in her favor against Husband, Wife may attempt to enforce that judgment in any manner she believes appropriate, including seeking a QDRO or a contempt order.

**ALIMONY**

Wife has waived any claim for permanent alimony.

## COUNSEL FEES

While counsel for Wife is apparently acting pro se, whatever that means in the context of this litigation, we believe Wife and her counsel are entitled to an award of attorney's fees solely because Husband's actions, including many appeals to the Appellate Courts, have been clearly frivolous, and raised issues that had no arguable legal merit. Attributing an hourly rate of One Hundred Twenty -Five Dollars ($125.00) per hour, which we believe to be the minimum charged by a Centre County attorney for domestic litigation, and believing Wife's counsel must have at least one hundred (100) hours of time spent solely because of Husband's delay tactics, we award Wife Twelve Thousand Two Hundred Fifty Dollars ($12,250.00) in attorney's fees. This amount may be reduced in the event the Supreme Court awards counsel fees pursuant to Wife's petition to that Court.

NOW this 1st day of December, 2016, IT IS HEREBY ORDERED and DECREED as follows:

1. By way of equitable distribution, Wife is awarded Eleven Thousand One Hundred Nine Dollars ($11,109.00) together with interest at the rate of six percent (6%) per annum from today's date.

2. Wife is awarded counsel fees in the amount of Twelve Thousand Two Hundred Fifty Dollars ($12,250.00) together with interest at the rate of six percent (6%) per annum from today's date.

3. Any alimony pendente lite order currently in effect shall terminate thirty (30) days from today's date or, in the event Husband files further appeals, thirty (30) days from any final order of the Appellate Courts.

4. This Court retains jurisdiction for enforcement purposes.

5. All outstanding motions filed by Husband are DISMISSED/DENIED.

Decree Re: Economic Issues, 12/1/2016, at 1-7.

Wife filed a motion for reconsideration pursuant to Pa.R.C.P. 1930.2 on December 27, 2016. The court granted Wife's motion on December 29, 2016, and held a hearing regarding the matter on January 25, 2017. On February 2, 2017, the court filed a discussion concerning Wife's motion for reconsideration and an amendment to its December 1, 2016, equitable distribution decree.[8]

---

[8] The court's "discussion" was dated January 30, 2017. In the "discussion," the court acknowledged a typographical error in the December 1, 2016 Order and corrected the award amount to Wife in paragraph one of the order to $16,109.00. Additionally, the court stated:

2. We have carefully considered all of the evidence presented by [Wife] with regard to the date of separation. As noted with regard to other valuations and arguments, we have accepted everything [Wife] has presented to us with regard to the date of separation including the additional materials set forth in her Motion for Reconsideration. Notwithstanding this additional material, we remain satisfied that the date of separation was November, 2001, resulting in a "marriage" of approximately one (1) year.

3. As previously noted, [Husband]'s career in the NFL did not span the course of the marriage. Nor did [Husband] receive benefits during the course of the marriage. Nor are we satisfied [Wife] has presented us evidence which would enable us to value any equitable share of the pension during the course of the marriage. Finally, we note [Wife]'s exhibit, an email from Michael L. Junk to [Wife]'s counsel dated November 30, 2015, in which he notes that "[Husband]'s pension did not increase in value between 2000 and 2004, and he could never 'cash-out' his pension during that timeframe." Based on the Junk communication alone, we believe [Wife] is not entitled to any portion of the NFL Pension.

4. With regard to military pensions and federal pensions, once again, albeit through no fault of [Wife], the evidence with regard to these pensions is woefully lacking. We do note however, that

Before a decision was rendered on her motion, Wife filed this appeal from the December 1, 2016, decree.[9]

On appeal, Wife raises the following issues:

1. Did the Trial Court abuse its discretion, misapply the law, and fail to follow proper legal procedure when the Trial Court first enters an order stating that "based on Wife's agreement ... the date of separation is 2004," (the date Wife filed her Complaint in Divorce), continues to affirm throughout the litigation that the separation date to be used for valuing marital property is 2004, and then later determines that the date of separation is November 2001, based on the sexual separation between Husband and Wife following the birth of Husband's son with his paramour?

2. Did the Trial Court abuse its discretion and misapply the law when it failed to include the increase in value of Husband's NFL Pension during the marriage as marital property pursuant to Section 3501(a)?

3. Did the Trial Court abuse its discretion and misapply the law when it ignored the record establishing Husband's right to a military pension and federal pension and failed to distribute those assets, which were earned during the marriage?

_____

[Husband] denied on several occasions during these lengthy proceedings, that he is receiving or entitled to any military pension or federal pension.

Discussion Regarding Wife's Motion for Reconsideration and Amendment to Decree, 2/2/2017, at unnumbered 1-2 (emphasis in original).

[9] Husband also filed two notices of appeal in this matter, which are at Docket Nos. 2036 MDA 2016 and 424 MDA 2017.

With respect to her appeal, the court did not order Wife to file a concise statement of errors complained of on appeal under Pa.R.A.P. 1925(b). The trial court issued a Pa.R.A.P. 1925(a) statement, relying on its December 1, 2016, decree and February 2, 2017, "discussion" regarding Wife's motion for reconsideration and amendment to decree.

4. Did the Trial Court abuse its discretion and fail to follow proper legal procedure when it refused to enforce an order for Contempt against Husband and to use its powers to gain Husband's compliance with discovery after he failed to provide information relating to his apparent military pension and federal pension?

Wife's Brief at 10-12.

The following principles guide our review:

> Our standard of review in assessing the propriety of a marital property distribution is whether the trial court abused its discretion by a misapplication of the law or failure to follow proper legal procedure. An abuse of discretion is not found lightly, but only upon a showing of clear and convincing evidence.

*Smith v. Smith*, 2006 PA Super 175, 904 A.2d 15, 18 (Pa. Super. 2006) (quoting *McCoy v. McCoy*, 2005 PA Super 411, 888 A.2d 906, 908 (Pa. Super. 2005)).... [I]n the context of an equitable distribution of marital property, a trial court has the authority to divide the award as the equities presented in the particular case may require. *Mercatell*, 854 A.2d at 611. "In determining the propriety of an equitable distribution award, courts must consider the distribution scheme as a whole. We measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights." *Morgante v. Morgante*, 2015 PA Super 145, 119 A.3d 382, 387 (Pa. Super. 2015) (quoting *Biese v. Biese*, 2009 PA Super 142, 979 A.2d 892, 895 (Pa. Super. 2009)). "[A] master's report and recommendation, although only advisory, is to be given the fullest consideration, particularly on the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties." *Moran v. Moran*, 2003 PA Super 455, 839 A.2d 1091, 1095 (Pa. Super. 2003).

*Cook v. Cook*, ___ A.3d ___, 2018 PA Super 117, *20 (Pa. Super. May 4, 2018).

In her first argument, Wife initially complains:

> In this case, the Trial Court abused its discretion and misapplied the law and failed to follow proper legal procedure when it first asked Wife for her agreement on a date of separation

- 11 -

of 2004 and entered an order on June 19, 2015, finding that the date of separation was 2004. Throughout the litigation, the Trial Court confirmed with Wife her agreement that the date of separation was 2004. Then, the date of separation was changed to 2001 in the final order. This is inherently unfair, misleading, and inexplicable.

Wife's Brief at 25-26.

By way of background, on June 19, 2015, the trial court held a hearing on the equitable distribution of the parties' marital property. *See* N.T., 6/19/2015, at 4. Wife did not attend the hearing due to a medical issue but her counsel was present. Husband also made an appearance. A review of the testimony reveals the date of separation was not discussed at the hearing. Thereafter, the court entered an order, which stated, in pertinent part:

NOW, June 19, 2015, this Order is entered to attempt to clarify various issues prior to a full evidentiary hearing on the question of equitable distribution and alimony.

…

3. Based upon Wife's agreement that the date of separation is 2004, all valuations should be based upon a marriage in 2000 and a separation in 2004.

…

The Centre County Court Administrator shall schedule a further one-day hearing on the issue of custody and a separate one-day hearing on the issue of equitable distribution.

Order, 6/19/2015, at unnumbered 1-2.

Contrary to Wife's argument, it is obvious the June 19, 2015, order was not intended to be a final order and did not provide a clear finding regarding the date of separation. Rather, the court merely asked that valuations be

based on Wife's opinion that the date of separation was in 2004, but the court did not explicitly determine the date of separation at that time. Rather, the court relied on Wife's own testimony, as well as Husband's testimony, when it found the date of separation was November, 2001, in its December 1, 2016, decree. *See generally* N.T, 5/4/2016; *see also* Trial Court Opinion, 12/1/2016 ("It is clear to us **based on a fair consideration of all the testimony**, that Wife stopped any voluntary relationship with Husband after the birth of Husband's other son … on September [], 2001, less than a month after the birth of the parties' child. While Husband apparently 'dropped in' from time to time at the Lemont home, we accept Husband's representation that those visits were solely for the purpose of seeing the parties' son.") (emphasis added). Accordingly, this issue fails.

Next, in a continuation of her first issue, Wife claims:

> The [t]rial [c]ourt abused its discretion and misapplied the law when it failed to find that the date of separation was the date that Wife filed her complaint in divorce and instead found that the date of separation was the date when the [t]rial [c]ourt believed that Wife stopped having sexual relations with Husband.

Wife's Brief at 27. Moreover, Wife states:

> Husband and Wife held themselves out publicly as a married couple until the time that Wife filed a complaint in divorce against Husband on June 8, 2004. Wife testified that they went on ski trips, vacations, and they celebrated important life events together, and Wife cared for and maintained the home. Wife also prepared meals, did laundry and paid bills while Husband came home from his military service as he was able. However, as the custody litigation shows, Husband and Wife also held themselves out as a married couple to the Courts in pursuing the custody litigation related to Wife's minor niece[.]

Between 1999 and 2004, Husband and Wife were involved in custody litigation involving Wife's minor niece. Throughout the litigation, Husband and Wife held themselves out to be a married couple. Husband and Wife filed complaints where they represented that they were "Harry Hamilton and Sherrilyn Hamilton" and "Aunt" and "Uncle" of the minor child. They appeared in Court and the Court recognized them as "Mr. and Mrs. Hamilton" and recognized Harry Hamilton as "the husband of Sherrilyn Hamilton." In 2005, after Wife had filed her complaint in divorce, Wife stopped pursuing the litigation for custody of her niece. In December 2005, the Superior Court of Pennsylvania recognized in its opinion that wife, "Aunt," was not an appellant in the instant appeal and that she had filed a complaint in divorce and custody against "Uncle" in June 2004.

*Id.* at 30-31.

When the date of final separation is in dispute,

[o]ur standard of review is one of an abuse of discretion. "Absent an abuse of discretion, the trial court's findings of fact, if supported by credible evidence of record, are binding upon a reviewing court." ***Wellner v. Wellner***, 699 A.2d 1278, 1280 (Pa. Super. 1997) (citations omitted). Only property acquired "prior to the date of final separation" is marital property and therefore subject to equitable distribution. 23 Pa.C.S. § 3501–02.

The date of final separation revolves around the definition of "separate and apart."

The Divorce Code defines "separate and apart" as follows: "Complete cessation of any and all cohabitation, whether living in the same residence or not." 23 Pa.C.S. § 3103. In ***Thomas v. Thomas***, 335 Pa.Super. 41, 483 A.2d 945 (1984), this court held that "cohabitation" means "the mutual assumption of those rights and duties attendant to the relationship of husband and wife." ***Id.***, at 47, 483 A.2d at 948.

Thus, the gravamen of the phrase "separate and apart" becomes the existence of separate lives not separate roofs (citations omitted). This position follows the trend of Pennsylvania case law in which a common residence is not

- 14 -

a bar to showing that the parties live separate and apart
... ***Flynn v. Flynn***, 341 Pa.Super. 76, 81, 491 A.2d 156,
159 (1985). *Compare **Mackey v. Mackey***, 376 Pa.Super.
146, 545 A.2d 362 (1988) (where parties had private living
quarters, no public social life together, and had ceased
sexual relations, the parties lived "separate and apart"
despite the fact that they resided in the same house) *with*
***Britton v. Britton***, 400 Pa.Super. 43, 582 A.2d 1335
(1990) (where parties jointly purchased a townhouse,
shared a joint checking account, had a social life as
husband and wife, share the same bedroom and resumed
sexual relations, the court found the parties were not living
"separate and apart.").

> ***Wellner***, 699 A.2d at 1281 (quoting ***Schmidt v. Krug***, 425
> Pa.Super. 136, 624 A.2d 183, 185 (1993) and ***Gordon v.
> Gordon***, 436 Pa.Super. 126, 647 A.2d 530, 534 (1994) *rev'd on
> other grounds*, 545 Pa. 391, 681 A.2d 732 (1996)).

***Teodorski v. Teodorski***, 857 A.2d 194, 197-98 (Pa. Super. 2004) (footnote

omitted).

The Divorce Code specifically addresses the date of separation.  ***See*** 23

Pa.C.S. § 3103.  This Court has previously stated:

We are also aware that the definition of "separate and apart"
found at 23 Pa.C.S. § 3103 was amended on November 29, 2004,
and became effective January 28, 2005. Prior to the 2004
amendment, the term "separate and apart" was defined as:
"[c]omplete cessation of any and all cohabitation, whether living
in the same residence or not." Notably, "[s]ection 5(1) of Act
2004-175 provides that "the amendment of the definition of
'separate and apart' ... shall apply to complaints served before,
on or after the effective date of this paragraph." 23 Pa.C.S. § 3103
Historical and Statutory Notes. Therefore, the fact that the
complaint in the instant case was served prior to the amendment
is of no moment; the amendment applies.  The amended definition
reads as follows:

> Cessation of cohabitation, whether living in the same
> residence or not. In the event a complaint in divorce is filed
> and served, it shall be presumed that the parties

- 15 -

> commenced to live separate and apart not later than the date that the complaint was served.
>
> 23 Pa.C.S. § 3103 (as amended in 2004 with effective date as of January 28, 2005).
>
> The new version of the definition contains specific language pertaining to a presumption that the date of separation, *i.e.,* the date on which the parties begin living separate and apart, is established upon the filing and serving of a divorce complaint, unless an earlier date can be substantiated through the presentation of evidence confirming an earlier date. "A presumption ... is a procedural device which not only permits an inference of the 'presumed' fact, but also shifts to the opposing party the burden of producing evidence to disprove the presumed fact. Failure to meet this burden of production will normally result in [a decision] ... in favor of the party invoking the presumption." **Commonwealth v. Slaybaugh**, 468 Pa. 618, 364 A.2d 687, 689 (1976). In short, "[t]he party attempting to rebut the presumption has the burden of proof." **CW v. LV**, 788 A.2d 1002 (Pa. Super. 2001).

**McCoy v. McCoy**, 888 A.2d 906, 911-912 (Pa. Super. 2005).

Turning to the present matter, the presumption for the date of separation was June 8, 2004, the date Wife filed the complaint. **See** 23 Pa.C.S. § 3103. Therefore, to rebut the presumption, the burden shifted to Husband to disprove this presumed fact. **See McCoy**, **supra**. At the June 19, 2015 hearing, Husband testified his "date of separation would have to occur the day after the Court [found] a marriage started," and he had not lived with Wife since 2000. N.T., 6/19/2015, at 18, 20. At a subsequent hearing on May 4, 2016, Wife testified she believed the parties' separation

occurred in 2004 when she moved out of Husband's Lemont, Pennsylvania, residence. N.T., 5/4/2016, at 15-17.[10]

Husband argued the parties' "separation occurred immediately after or practically immediately after the execution of the affidavit" of marriage. *Id.* at 43. When the court asked Wife to respond to Husband's assertion, she stated she filed her divorce complaint in 2004 and indicated the following: "I was still living in the martial home. He was still coming and going. We were still a married couple." *Id.* at 44. The following exchange then occurred:

> [Husband]: So is it your testimony today that our disagreements had nothing to do with the fact that I was away from any home in State College and spending time with [my paramour and my son from that relationship]?

_____

[10] Prior to that time, Wife described her marital lifestyle as follows:

> I was pretty much the caretaker of the home. I did the dishes, repairs that had to be done. If I could do them, I did them, called in a repairman if I could not.
>
> I kept the landscaping on the outside of the home up, did the snow removal, cut the grass, cooked and cleaned, was raising my son, teaching him the morals of life, teaching him his ABCs, 123s, riding his bike, tying his shoes, baking him cookies, you know.
>
> When I knew Mr. Hamilton would be coming home, his meal would be waiting on the table. A typical – I would think a typical, you know, like you do for your husband.
>
> …
>
> We went to the park. We went on bike rides. We'd do vacations to the beach, trips to Wilkes-Barre to the ski lodge in the wintertime, traveling.

N.T., 5/4/2016, at 28-29.

[Wife]: [Husband], when you created your other family and I had my son, okay, my focus was no longer on you. My focus was on raising my son and taking care of me the best way I knew how.

So I'm not sure where you're trying to go with this, but I could care less about your other family, and that's just a fact. My concerns were then for my son that I gave birth to.

[Husband]: So your testimony is that there were no disagreements about my spending time away from State College and with [my paramour and my other son]? That's your testimony, that there were no disagreements you and I had?

[Wife]: I'm not going to sit here and say that I might not have been angry and upset about it, but at the same token, I'm going to testify I had no idea where you were, whether you were with them, whether you were with another woman or another woman, because you just had multiple women, and by the time I found out I was pregnant, I was going to raise my child and take care of my own.

So I can't tell you where you were and who you were with and on what day. I can't sit here and say how many children you have.

[Husband]: And is it your testimony that it didn't matter to you, you were going to have my dinner prepared every time I came to the house you were living in; is that your testimony?

[Wife]: That was when I was in love with you. That was when I was doing my wifely duties, as I had my son, to keep my son and my marriage at that time still intact until I went through the proceedings that I needed to go through the proceedings with.

So it is my testimony that yes, you came home, I had dinner. I had to fix dinner. I had to fix dinner for my son. I had to fix dinner for myself. So if your dinner was ready, your dinner was ready. I was still being a good wife.

*Id.* at 46-48. Lastly, Wife acknowledged she ceased marital relations with Husband after learning about the birth of his other son in 2001. *Id.* at 50-51.

- 18 -

As noted above, the court found the following:

> It is clear to us based on a fair consideration of all the testimony, that Wife stopped any voluntary relationship with Husband after the birth of the Husband's other son ... on September [], 2001, less than a month after the birth of the parties' child. While Husband apparently "dropped in" from time to time at the Lemont home, we accept Husband's representation that those visits were solely for the purposes of seeing the parties' son. We find, therefore, that this date of separation is November 2001.

Trial Court Opinion, 12/1/2016, at 2.

Keeping our standard of review in mind, we agree with the trial court's conclusion. Husband bears the burden of proof because he opposed the presumed fact that the date of separation occurred when Wife filed the divorce complaint and therefore, he needed to demonstrate that either he or Wife possessed the "independent intent ... to dissolve the marital union" and that the intent was "clearly manifested and communicated to the other spouse." *Sinha v. Sinha*, 526 A.2d 765, 767 (Pa. 1987). The trial court found Husband's evidence credible, which was within its discretion. *See Teodorski*, *supra*. Additionally, the court accepted Wife's own admissions as credible. The record demonstrates that regardless of certain appearances, the parties were living separate lives despite being under the same roof at certain points during the marital time at issue. Accordingly, the trial court did not abuse its discretion in finding Husband and Wife were living "separate and apart" in

2001, and therefore, the November 2001 date of separation was proper.[11]

***See Teodorski***, ***supra***.

Next, Wife complains the trial court "abused its discretion and misapplied the law when it failed to include the increase in value of Husband's NFL [p]ension during the marriage as marital property pursuant to Section 3501(a)." Wife's Brief at 33. Specifically, she states:

> Although Husband's benefit from the NFL Plan was a result of his playing time before the marriage and, therefore, the benefit is not in and of itself marital property, any increase in value of the NFL Pension during the marriage is marital property under Section 3501(a) of the Marital Code.
>
> …
>
> Thus, any increase in value of the NFL pension during the marriage is clearly marital property that is subject to equitable division.

Wife's Brief at 34.

Marital property is defined, in pertinent part, as follows:

> **(a) *General rule.* —** As used in this chapter, "marital property" means all property acquired by either party during the marriage

---

[11] To the extent Wife argues the fact that the parties were involved in a custody litigation involving her minor niece is proof that the parties still held themselves out as a married couple until 2005, we disagree. First, Wife does not point to any place in the record that she presented this allegation to the court, even though she alleges in her December 27, 2016, motion for reconsideration that she was prepared to do so. ***See*** Wife's Motion for Reconsideration Pursuant to Pa.R.C.P. 1930.2, 12/27/2016, at 3, ¶ 6. Furthermore, she never requested to introduce this testimony after Husband presented his rebuttal position that 2001 was the date of separation at the May 4, 2016, hearing. Lastly, none of the proceedings in custody was ever made part of this record. The trial court acted within its province by denying Wife's motion for reconsideration.

and the increase in value of any nonmarital property acquired pursuant to paragraphs (1) and (3) as measured and determined under subsection (a.1). However, marital property does not include:

> **(1)** Property acquired prior to marriage or property acquired in exchange for property acquired prior to the marriage.

23 Pa.C.S. § 3501(a)(1).[12]

As noted above, the trial court found the following:

> Husband's career in the NFL ended prior to the date of marriage. As best we understand the evidence, Husband did not begin receiving benefits until after the date of separation. No definitive evidence was presented with regard to any increase in value between 2000 and 2001 in Husband's NFL Pension. Because of the brief length of the marriage, we find Wife is not entitled to any portion of Husband's pension or any future recovery under pending concussion litigation.

Decree Re: Economic Issues, 12/1/2016, at 3. In its subsequent explanation, the court further stated:

---

[12] Moreover, the Divorce Act provides:

> **(a.1) Measuring and determining the increase in value of nonmarital property.--**The increase in value of any nonmarital property acquired pursuant to subsection (a)(1) and (3) shall be measured from the date of marriage or later acquisition date to either the date of final separation or the date as close to the hearing on equitable distribution as possible, whichever date results in a lesser increase. Any decrease in value of the nonmarital property of a party shall be offset against any increase in value of the nonmarital property of that party. However, a decrease in value of the nonmarital property of a party shall not be offset against any increase in value of the nonmarital property of the other party or against any other marital property subject to equitable division.

23 Pa.C.S. § 3501(a.1). The statute requires there to be an offset between the increase and decrease in non-marital property of a party.

As previously noted, [Husband]'s career in the NFL did not span the course of the marriage. Nor did [Husband] receive benefits during the course of the marriage. Nor are we satisfied [Wife] has presented us evidence which would enable us to value any equitable share of the pension during the course of the marriage. Finally, we note [Wife]'s exhibit, an email from Michael L. Junk to [Wife]'s counsel dated November 30, 2015, in which he notes that "[Husband]'s pension did <u>not</u> increase in value between 2000 and 2004, and he could never 'cash-out' his pension during that timeframe." Based on the Junk communication alone, we believe [Wife] is not entitled to any portion of the NFL Pension.

Discussion Regarding Wife's Motion for Reconsideration and Amendment to Decree, 2/2/2017, at unnumbered 1-2 (emphasis in original).

The November 30, 2015, email from Michael Junk, counsel to the NFL Plan, to Wife's counsel ("the Junk email") stated, in pertinent part:

1. I can't determine the amount of benefits you think [Wife] is entitled to. I assumed you'd present all of these arguments to a court and a court would tell the Plan exactly what to do.

2. Even putting aside the present-day-value, interest, and damages components of your equations, your proposed calculation regarding the value of [Husband]'s pension benefits is not possible. As we discussed on the phone the other week, [Husband]'s pension did not increase in value between 2000 and 2004, and he could never "cash out" his pension during that timeframe.

3. [Husband] has two pension benefits under the terms of the Bert Bell/Pete Rozelle NFL Player Retirement Plan. One is called his "Benefit Credit" Pension. The other is called his "Legacy Credit" pension. I address them in turn below.

4. Benefit Credit pension. The value of [Husband]'s Benefit Credit pension is/was determined based on several factors, including (i) his years of service in the NFL, (ii) the number of his years of service in the NFL, and (iii) the dollar value assigned to each of his years of service under the terms of the Plan. Between 2000 and 2004, the value of his Benefit Credit pension did not change. He could not "cash it out" between 2000 and 2004.

On July 5, 2006, [Husband] received an "Early Payment Benefit" (i.e., an advance payment) on his Benefit Credit pension. The amount paid to him in July 2006 was $49,461.96. The Early Payment Benefit is the actuarial equivalent of 25% of the value of the Player's Benefit Credit pension. He could have elected that Early Payment Benefit in December 2000. Had he done so, the lump-sum payment at that time would've been $24,209.06. He could've elected that Early Payment Benefit in June 2004. Had he done so, the lump-sum payment at that time would've been $41,369.64.

[Husband] is in pay status on the remainder of his Benefit Credit pension. [Husband] elected to receive these payments in what we call a Social-Security-adjusted payment form. His first monthly payment [was] issued on 2/1/2015 in the amount of $2,193.34. It will be payable in that amount until 11/1/24, and it will then reduce to $263.34 on 12/1/24, payable in that amount for the remainder of [Husband]'s lifetime. If [Wife] obtained a QDRO, I believe she would be entitled to receive a portion of this monthly payment; she cannot now change the form of payment because payments have already started.

5. Legacy Credit pension. The value of [Husband]'s Legacy Credit pension is based on (i) his years of service in the NFL, (ii) the number of his years of service in the NFL, and (iii) the Legacy Credit/dollar value assigned to each of his years of service under the terms of the Plan. Between 2000 and 2004, the value of the Legacy Credit pension did not change.

[Husband] has not yet elected to receive his Legacy Credit pension. In October, I was told that the monthly Legacy Credit payment to [Husband] would be approximately $724.90, depending upon the form of the election and assuming he elected to receive it beginning November 1, 2015. Because [Husband] is not in pay status for the Legacy Credit pension, I believe [Wife] could obtain a QDRO that would give her a portion of this pension benefit that she could elect to take, on her own, in the future.

Wife's Trial Memorandum in Support of Her Request for Equitable Distribution,

9/15/2016, at Exhibit B.

Wife argues Section 4 of the email negates Section 2, which the trial court relied on in its determination. *See* Wife's Brief at 35. In support of this assertion, she states:

> Note that Section 4 of the email states that Husband could have elected an early payout benefit in 2000, and if he had done so, he would have received $24,209.06. It also states that he could have elected an early payout benefit in 2004, and if he had done so, he would have received $41,369.64. Thus, the early payout benefit clearly increased in value between 2000 and 2004. And, notwithstanding the statement in Section 2 of the Junk email to the effect that there was no increase in value from the perspective of the NFL, there was an actual economic increase in value between 2000 and 2004. In fact, in every case in which there is a deferral in a payment of a pension the recipient is expecting an increase in value, reflecting the earning of interest or profit as a result of the time value of money. Further, the statement in the Junk email to the effect that "he could never cash-out his pension during that time frame" is obviously not referring to the early payout benefit.

*Id.* at 35-36.

We disagree for several reasons. First, the Junk email explicitly, and on multiple occasions, stated Hamilton's pension did not increase in value between 2000 and 2004, let alone between 2000 and 2001, and he was not permitted to "cash out" his pension during that timeframe. Moreover, we are guided by the following:

> As we must defer to the legislature as the policy making body, we conclude that the holding in **Berrington** [**v. Berrington**, 633 A.2d 589 (Pa. 1993),] no longer controls regarding the use of the salary at time of separation. Instead, we honor the legislature's unequivocal intention to utilize the coverture fraction to provide economic justice between the parties, as discussed by the Superior Court in **Holland** [**v. Holland**, 588 A.2d 58 (Pa. Super. 1991)]:

A delayed distribution of pension benefits requires the non-employed spouse to wait until some indefinite time in the future to receive the marital share. To compensate for this postponement of benefit, that spouse is permitted to enjoy increases in value occasioned by continued employment of the worker. Also, the employed spouse increases the non-marital share of the benefits since continuing service enlarges the denominator. Further, later year wage increases are a product of experience and longevity which were developed during the marriage. The [employee-spouse] . . . can look forward to the benefits which accrue from a vested pension. His former spouse is entitled to share in any increase in value of the marital share which may occur by [the employee-spouse's] continued employment.

*Holland*, 588 A.2d at 60. Accordingly, rather than using the salary at the time of separation, courts instead should allocate the pension "between its marital and nonmarital portions solely by use of a coverture fraction." 23 Pa.C.S. § 3501(c). Thus, the **non-employee spouse "is permitted to enjoy increases in value occasioned by continued employment of the worker**." *Holland*, 588 A.2d at 60. In the simplest of cases, the determination of the marital portion of a defined benefit pension will entail a straightforward application of the coverture fraction to the final total value of the pension, even though the value has increased due to years of postseparation employment.

*Smith v. Smith*, 938 A.2d 246, 258-259 (Pa. 2007) (emphasis added).

Turning to the present matter, the Junk email indicates there are three factors that determined the value of Husband's pension: (1) his years of NFL service; (2) the number of his years of service in the NFL; and (3) the dollar value assigned to those years of service. Accordingly, because Husband was no longer serving in the NFL when he was married to Wife, those factors would have not changed during that time, and there would have not been any potential for an "increase" in the pension calculation as there was no

"continued employment" by Husband. **See Holland**, **supra**. Therefore, there was no value to be applied to the equitable distribution total from Section 3501(a)(1) regarding Husband's pension. Additionally, while Husband may have taken an advanced payment on the pension in 2006, this was post-date of separation and does not qualify as an actual distribution of the pension. As such, Wife's second argument fails.

Third, Wife claims the court "abused its discretion and misapplied the law when it ignored the record establishing Husband's apparent right to a military pension and federal pension and failed to distribute those assets, which were earned during the marriage." Wife's Brief at 38. She states that both of Husband's pensions "are defined-benefit pensions, and therefore, should be distributed pursuant to the coverture fraction method" as set forth in 23 Pa.C.S. § 3501(c)(2).[13] **Id.** at 39.

_____

[13] Section 3501(c)(2) provides:

> **(c)  Defined benefit retirement plans. —** Notwithstanding subsections (a), (a.1) and (b):
>
> **…**
>
> **(2)**  In the case of the marital portion of a defined benefit retirement plan being distributed by means of an immediate offset, the defined benefit plan shall be allocated between its marital and nonmarital portions solely by use of a coverture fraction. The denominator of the coverture fraction shall be the number of months the employee spouse worked to earn the accrued benefit as of a date as close to the time of trial as reasonably possible and the numerator shall be the number of

A review of the record reveals the following: At the June 19, 2015, hearing, the following exchange occurred between the trial court and Husband:

> THE COURT: Are you receiving a pension from the government at all?
>
> [Husband]: No, Your Honor.
>
> THE COURT: That's because you're still employed; is that right?
>
> [Husband]: I have let them know that I plan to leave. I put in for a leave without pay.

N.T., 6/19/2015, at 40.

Thereafter, at the May 4, 2016, hearing, Husband testified he has worked as attorney for the federal government since 1995 at various agencies. N.T., 5/4/2016, at 58. Husband indicated he was unemployed at the time of the hearing. *Id.*[14] Further, at the time of his departure, he was making

_____

such months during which the parties were married and not finally separated. The benefit to which the coverture fraction is applied shall include all postseparation enhancements up to a date as close to the time of trial as reasonably possible except for enhancements arising from postseparation monetary contributions made by the employee spouse, including the gain or loss on such contributions

23 Pa.C.S. § 3501.

[14] Husband testified his unemployment was the result of the following: "Because I thought it was best to be at home for my son after Children and Youth came to the home, because I believe that I began to suffer the effects of chronic traumatic encephalopathy, effecting [sic] memory and recall, and I believe [that] I was … somewhat forced out of employment because I was not keeping pace." N.T., 5/4/2016, at 59.

approximately $75,000.00 a year. When asked by the court if he was receiving a pension, Husband responded: "I'm receiving health benefits, and I believe it's $500 a month. That would be where the $2,700 figure came from, the combined income." *Id.* at 59. Subsequently, the following questioning occurred between Wife's counsel and Husband:

Q. And on June 22, 2015, Judge Williamson asked you to provide information regarding your pensions.

Have you provided any information or brought any information today regarding the value of your pensions with the government or the Army?

A. Well, I have seen your file sitting next to me, and I know that you provide – you have gotten them through subpoena and other ways.

What I did do during the discovery process was say that this information is available. This information is public knowledge, and at any time, you can come to any one of the homes and go through, because as much work that I have you would have trying to get it.

Specifically, I wrote letters, I wrote one letter Judge Williamson suggested on March 1st that I come to him for help. That help I provided in the form of asking that a certified question be sent to the Supreme Court regarding proceeding forward in this matter.

That was the help I requested when I informed everyone on March 1st that I sent a letter, because he asked for something for the Eastern District. I did not get a reply. I still have not gotten a reply.

I believe that the Fifth Amendment stay that was in place November 4, 2013 covered me from the Fifth Amendment that I raised at that time to provide some of the other information.

Q. So when did you stop working for the Army?

- 28 -

A. Probably right around the time your client and her family reported bigamy [in regards to him] to the Department of the Army and began making a lot of phone calls.

That pretty much put me in a status as a lawyer, as a JAG, in a -- I'll say be seen and not heard or be heard and not seen status.

My understanding having changed from active duty in 2000, a month and 35, 40 days of the execution of the affidavit. When I left active duty, I then entered reserve status.

…

I'm not receiving any money, though. They don't pay you when you're in that status….

[THE COURT]: Why don't you get paid for reserve status anymore?

[Husband]: Again, Your Honor, because I believe that since the pending investigation and upon muted advice, if you will, right now I'm in a seen and not heard or heard and not seen until the litigation concludes, which it doesn't seem like it is, because that bigamy aspect still looms….

*Id.* at 68-70.

In addressing this issue, the trial court concisely opined:

With regard to military pensions and federal pensions, … albeit through no fault of [Wife], the evidence with regard to these pensions is woefully lacking. We do note however, that [Husband] denied on several occasions during these lengthy proceedings, that he is receiving or entitled to any military pension or federal pension.

Discussion Regarding Wife's Motion for Reconsideration and Amendment to

Decree, 2/2/2017, at unnumbered 2.

In response to the trial court, Wife claims:

- 29 -

> This statement is contrary to the record. On June 19, 2015, Husband testified that he was entitled to a Federal Government pension, having worked as an attorney/advisor for the federal government since 1995. He testified that he makes $79,000 annually and he is at a GS-12 level. Further, he stated that he had been employed by the US Army for what appears to be at least 20 years.

Wife's Brief at 39-40.[15]

Based on the lack of evidence, we are constrained to find the trial court did not abuse its discretion by a misapplication of the law or a failure to follow proper legal procedure. **See Smith**, **supra**. Indeed, the record is deficient with any financial information regarding Husband's federal government and military pensions. Further, based on Husband's testimony, it is unclear whether he is eligible for these pensions because of his prior actions. We acknowledge Wife did take numerous steps to obtain this information from Husband; however, "[t]he failure of the appellant to ensure that the original record certified for appeal contains sufficient information to conduct a proper review may constitute a waiver of the issues sought to be examined." **Stewart v. Owens-Corning Fiberglas**, 806 A.2d 34, 37 n.3 (Pa. Super. 2002). Absent these financial documents, we cannot conduct a meaningful appellate review with regard to Husband's two pensions, which remain speculative. We reiterate that "a trial court has the authority to divide the

---

[15] Wife asks this Court to order the trial court to, if legally possible, request the federal government and United States Army to stop making portion payments to Husband, determine the status of these pensions, and determine the marital pension of any pension. **Id.** at 40.

award as the equities presented in the particular case may require." ***Cook***,

___ A.3d at ___, 2018 PA Super 117, *20. Here, the trial court awarded Wife

100% of the marital assets, instead of her requested 65% portion, due to

Husband's behavior throughout this litigation. Therefore, one could

reasonably infer the court did take the lack of pension evidence into

consideration when awarding Wife the full amount of marital assets.

Accordingly, Wife's third argument fails.

Lastly, Wife argues the trial court "abused its discretion and failed to

follow proper legal procedure when it refused to enforce an order for

[c]ontempt against Husband and to use its powers to gain Husband's

compliance with discovery after he failed to provide information relating to his

apparent military pension and federal pension." Wife's Brief at 40-41.

Specifically, she states:

> Discovery for information necessary to represent Wife in the equitable distribution hearings was requested as early as February 20, 2009. Despite multiple requests and court orders, Husband never provided any requested information. Husband was initially ordered on October 17, 2011, to "respond to all discovery requests within 20 days." Husband never provided the requested information. Husband was again ordered to respond to discovery requests on August 23, 2013. Despite a Superior Court Opinion affirming the August 23, 2013 Order of the Court of Common Pleas of Centre County holding Husband in contempt of a discovery order and ordering Husband to respond to all outstanding discovery requests within 30 days or serve a 30-day period of incarceration, Husband never complied with any court orders for discovery. On May 8, 2015, Wife filed a Motion for Sanctions for Non-compliance with Order of Court and Motion to Enforce Contempt Order of August 28, 2013. In the [t]rial [c]ourt's June 4, 2015 Order, it states that it will consider this Motion at the hearing on June 18, 2015. Judge Williamson notes in his June 19,

2015 Order, that he will "hold in abeyance any effort to incarcerate Husband" and cautions Husband that he must comply with the rest of the [o]rder requesting discovery. Judge Williamson further ordered Husband to provide values of assets based on Wife's agreement that the date of separation is 2004. On September 15, 2016, the [t]rial [c]ourt determined that it would "not be appropriate" to incarcerate Husband because he did file objections years ago but did not "file anything that helps this Court to move this case forward in 14 years." Ultimately, Husband never cooperated, and the Trial Court stated that it "accepted the calculations of value made by Wife as a sanction for Husband's lack of cooperation."

*Id.* at 41-43 (citation omitted).

With respect to this issue, we are guided by the following:

The power to punish for contempt, including the power to inflict summary punishment, is a right inherent in the courts and is incidental to the grant of judicial power under the Constitution. *Colbert v. Gunning*, 368 Pa. Super. 28, 533 A.2d 471, 472 (Pa.Super. 1987). The court may order civil or criminal contempt.

> The characteristic that distinguishes civil from criminal contempt is the ability of the contemnor to purge himself of contempt by complying with the court's directive. If he is given an opportunity to purge himself before imposition of punishment, the contempt order is civil in nature. If the purpose of the order is to punish despite an opportunity to purge, the order is criminal in nature. *Id.*

A court may exercise its civil contempt power to enforce compliance with its orders for the benefit of the party in whose favor the order runs but not to inflict punishment. *Id.* A party must have violated a court order to be found in civil contempt. [*Goodman v. Goodman*, 383 Pa. Super. 374, 556 A.2d 1379, 1391 (Pa. Super. 1989)]. The complaining party has the burden of proving by a preponderance of evidence that a party violated a court order. *C.R. by the Guardian of her Estate, Dunn v. The Travelers*, 426 Pa. Super. 92, 626 A.2d 588, 592 (Pa.Super. 1993). However, a showing of non-compliance is not sufficient in itself to prove contempt. *Wetzel v. Suchanek*, 373 Pa. Super. 458, 541 A.2d 761, 762 (Pa. Super. 1988). If the alleged contemnor is unable to perform and has in *good faith* attempted

to comply with the court order, contempt is not proven. *Id.* (emphasis in original). The alleged contemnor has the burden of proving the affirmative defense that he has the present inability to comply with the court order. *Commonwealth ex rel. Ermel v. Ermel*, 322 Pa. Super. 400, 469 A.2d 682, 683 (Pa.Super. 1983). A court cannot impose a coercive sentence conditioned on the contemnor's performance of an act which is incapable of performance. *Crozer-Chester Medical Center v. Moran*, 522 Pa. 124, 560 A.2d 133, 137 (Pa. 1989). To impose civil contempt the trial court must be convinced beyond a reasonable doubt from the totality of evidence presented that the contemnor has the present ability to comply with the order. *Wetzel*, 541 A.2d at 764.

*Sinaiko v. Sinaiko*, 664 A.2d 1005, 1009 (Pa. Super. 1995) (internal quotation marks and parallel citations removed). *See also Lachat v. Hinchliffe*, 769 A.2d 481, 487 (Pa. Super. 2001) (citations modified).

We emphasize the trial court "may exercise its civil contempt power to enforce compliance with its orders[,]" but is not required to do so. *Sinaiko*, 664 A.2d at 1009. Turning to the present matter, the trial court acted within its discretion when it refused to enforce the order for contempt against Husband. Again, we can infer from the 100% amount of marital assets awarded to Wife that the court chose a different method than enforcing the contempt order, but was still penalizing Husband for his acrimonious and obdurate actions. As such, Wife's final claim is without merit.

Order affirmed.

Judge Dubow joins this memorandum.

Judge Strassburger files a concurring memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/12/2018